Commonwealth *v.* Banks, Appellant.

54

Argued November 29, 1967. Before BELL, C. J., MUSMANNO, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*David C. Harrison,* and *Kramer and Harrison,* for appellant.

*Martin A. Heckscher,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 15, 1968:

On January 26, 1966, the appellant, Ellis Banks, was convicted by a jury in Philadelphia County of the crimes of robbery and murder in the first degree. On the murder conviction, the jury fixed the penalty at life imprisonment. Post-trial motions in arrest of judgment and for a new trial were dismissed. Banks was then sentenced to imprisonment for a term of five to ten years on the robbery conviction and to life imprisonment on the murder conviction. Appeals from the judgments of sentence are now before us.[1]

At trial a typewritten recorded statement of guilt made by Banks to the police was introduced in evidence. In our view this statement was obtained under circumstances which render its evidentiary use a denial of due process of law. For this reason we reverse and order a new trial.

---

[1] An appeal from the judgment of sentence imposed on the robbery conviction was filed in the Superior Court and certified here.

The pertinent facts of record are these:[2]

At about 7 p.m. on December 31, 1964, George Turk left his place of employment in the city of Philadelphia and proceeded to his automobile parked on a public street nearby. As Turk entered the vehicle, James Lewis also entered it, intending to rob him. Lewis assaulted Turk severely, causing injuries which resulted in his death. A citizen who came upon the scene as the assault and robbery were in progress saw the appellant Banks standing about 30 feet away from the Turk automobile, "looking back and forth." As this citizen went to the aid of Turk, Lewis fled and, as he did so, "kind of waved" to Banks. Banks remained on the scene and assisted in aiding the victim. The police arrived at the site shortly afterwards and Banks, upon being asked "if he had seen what happened." said "no," but then changed this to "yes." He was taken to police headquarters, questioned and released.

On January 3, 1965, two investigating police officers went to the Banks home, informed him that they would like to question him further about the Turk case and asked him to accompany them to police headquarters. The three proceeded via police squad car to the Homicide Headquarters of the police department, located about one-half hour traveling time away. Banks readily answered all questions. His statements were exculpatory in nature and he was allowed to leave. During this questioning Banks stated he was employed

---

[2] A hearing as mandated by *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964), was conducted by the trial court, following which the statement involved was ruled admissible as evidence over objection. The facts concerning the circumstances under which the statement was obtained, detailed in this opinion, are those elicited from a Commonwealth police witness who testified at the "Jackson" hearing. Banks contradicted this testimony in material part, but for the purpose of these appeals we accept the Commonwealth's evidence as true.

by a certain business firm in Philadelphia. Through later inquiry, the police learned this was untrue. As a result the two police officers returned to the Banks home at about 2 p.m. on January 4th, "picked up" Banks and drove him in a police car to Homicide Headquarters. Before leaving his home Banks was informed the police desired "to further interview him concerning information he had stated in the first interview."

Banks was then questioned at police headquarters for about two hours or from 2:30 p.m. to 4:30 p.m. He was asked why he made a false statement about his employment when questioned the day before. He "tried to explain that away" but "finally came out and said he was involved in the robbery of Mr. Turk" as "a lookout" and Lewis was the actual robber and assaulter.

The specific time or point in the interview when this admission of guilt was made is not clear from the record. However, it is conceded that before this occurred Banks was not warned at any time of his constitutional rights including the right to remain silent. Following the incriminating admission Banks was immediately placed under arrest and advised for the first time of his right to remain silent.

Shortly thereafter the police officers accompanied by Banks left headquarters and sought out and picked up Lewis. Both men were then questioned at headquarters. Beginning about 8:35 p.m., Banks in answer to questions made an incriminating statement in line with his previous admissions, which was recorded on a typewriter and when completed was signed by him. It is this statement which was introduced in evidence at trial.

The instant trial occurred subsequent to *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758 (1964), and whether or not the constitutional rights of Banks were

adequately protected at the time the statement involved was obtained must be determined in the light of that decision. *Commonwealth v. Jefferson,* 423 Pa. 541, 226 A. 2d 765 (1967) ; *Johnson v. New Jersey,* 384 U.S. 719 86 S. Ct. 1772 (1966). Under *Escobedo,* as explicated by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), it is absolutely essential that before an individual is subjected to police custodial interrogation he must at least be first warned of his constitutional right to remain silent. Otherwise, the evidentiary use of any statements stemming therefrom is constitutionally proscribed. *Commonwealth v. Jefferson,* supra; *Miranda v. Arizona,* supra.

The Commonwealth argues that up to the moment Banks first admitted his participation in the crime, he was merely being questioned as "a witness" to a crime and it was unnecessary to advise him of his right to remain silent so long as this role continued. With this we cannot agree. The appellation given the individual questioned is not controlling. Otherwise the police could evade the procedural safeguards required by *Escobedo,* supra, and *Miranda,* supra, to protect one's privilege against self-incrimination during police questioning by interviewing everyone as "a witness." If questioning is initiated and pursued during custodial interrogation, proper warning of constitutional rights is first required, *Miranda v. Arizona,* supra. While the courts of other jurisdictions have experienced difficulty in determining whether questioning under certain circumstances constitutes "custodial interrogation,"[3] there is universal agreement that if the

---

[3] See *People v. Allen,* 50 Misc. 2d 897, 272 N.Y.S. 2d 249 (S. Ct. 1966) ; *People v. Colleran,* 35 U.S.L. Week 2540 (N.Y.S. Ct. 1967) ; *People v. Rodney,* 36 U.S.L. Week 2377 (N.Y. Ct. of Appeals 1967) ; *Gaudio v. State,* 1 Md. App. 455, 230 A. 2d 700 (Md. Ct. of Special Appeals 1967) ; *People v. Arnold,* 58 Cal. Rptr. 115, 426 P. 2d 515 (Calif. S. Ct. 1967).

police questioning occurs under an atmosphere or circumstances which leave the individual questioned no freedom or choice and which are inherently coercive,[4] this is "custodial interrogation." After considering the circumstances and atmosphere existing when Banks was questioned by the police on January 4th, there is no doubt in our minds that he had little or no freedom of choice and the situation was inherently coercive. Cf. *Commonwealth v. Sites,* 427 Pa. 486, 235 A. 2d 387 (1967).

The final question is whether or not the recorded statement admitted in evidence secured after Banks was advised of his right to remain silent was purged of the original illegality. We conclude not.

As explained in *Commonwealth v. Moody,* 429 Pa. 39, 239 A. 2d 409 (1968), a statement or confession made subsequent to another confession or incriminating admission obtained absent a required warning of constitutional rights may not be used as evidence, unless it is first established that the last statement or confession was not the exploitation of the original illegality and was obtained under circumstances sufficiently distinguishing to purge it of the original taint. After a careful consideration of all the attending circumstances, we are not persuaded that the original illegality was dissipated by the subsequent events, or the statement involved was so unrelated to the original questioning as to purge it of the taint thereof.[5]

Judgments reversed and new trial ordered.

Mr. Justice JONES took no part in the consideration or decision of this case.

---

[4] In this sense the word "coercive" has no relationship to "coercion" See 28 U. of Pitt. L. Rev. 77, 79 (1966).

[5] Cf. *Clewis v. Texas,* 386 U.S. 707, 87 S. Ct. 1338 (1967), and *Commonwealth of Pennsylvania ex rel. Craig v. Maroney,* 348 F. 2d 22 (3d Cir. 1965).

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I do not believe one can read the Majority Opinion in this case, whether he be judge, lawyer or civilian, and not feel disturbed. I do not criticize the opinion writer or those who agree with him since they feel obliged, under decisions of the Supreme Court of the United States, to order a new trial, but their approach to the serious question before us does not satisfy me.

The subject of this appeal is a brutal, savage murder, accomplished only for sordid gain, a murder without the slightest excuse for amelioration of the penalty society demands the murderer pay. The actual physical slayer was a James Lewis who, for robbery, attacked the victim, George Turk, as he sat in his automobile, and rained such blows on him that he died from the effects of the barbaric battery. While the homicidal attack was taking place, Ellis Banks, the defendant in this case, stood on the highway to warn Lewis should anyone happen by before the sanguinary deed was finished. So far as gravity of crime is concerned, Banks' hands are just as deep in blood as Lewis's because, in the first place he was participating in a felony-murder, and, secondly, he was actively assisting in the crime by protecting his fellow-murderer.

Someone did happen by and, when Banks gave the alarm, Lewis fled, but Banks, fearing detection of his complicity in the affair, feigned nonparticipation and, in the presence of the man who had arrived, an Otto Williams, went through the motion of wiping blood from the head of the dying motorist. To the questioning of police who now appeared on the scene, Banks answered that he did not know what had occurred. Later, however, apparently realizing he was in the presence of people who knew he had witnessed the event, he admitted having seen the assault, but denied knowledge of identity of the assailant.

He was taken to a nearby police station and, after further questioning, was released. Several days later two police officers called at his home and asked Banks to accompany them to the police station where he was again questioned about the robbery and murder. Banks at no time manifested any reluctance to speak and answered all questions willingly. His statements, as stated in the Majority Opinion, were exculpatory in nature and he was allowed to leave. In the course of the interrogation, Banks stated he was employed by a certain firm. In furthering their investigation, the police learned that Banks was not employed at the place he had indicated and he was once again taken to police headquarters to explain the apparent discrepancy in the statement about his employment. Banks entered into a long explanation on this subject and then suddenly blurted out that, yes, he had been involved in the robbery and death of George Turk but hastened to add that he had only acted as a lookout.

Upon making this spontaneous declaration, a Detective Wood immediately informed Banks that he had the right to remain silent, that anything he said could be used against him, that he could have an attorney to represent him, and so on—all the bonuses that the *Escobedo* and *Miranda* decisions of the United States Supreme Court allow to confessing criminals.

In his account of the crime in which he participated, Banks named James Lewis as the actual killer of George Turk. The police arrested Lewis and then both he and Banks were questioned by the police. Banks now gave a formal narrative of the part he had played in the killing, this statement was recorded on the typewriter and he signed it. The confession was later introduced at his trial and he was convicted. He appealed to this Court, contending he had been deprived of his constitutional rights.

62

The Majority of this Court agree with Banks, citing *Escobedo v. Illinois*, 378 U.S. 478, as "explicated," using the language of the Majority (it might better have said as *aggravated*) by *Miranda v. Arizona*, 384 U.S. 436.

Most of the monumental historical court decisions upholding personal liberty and constitutional guarantees have been founded on situations where innocent persons were being persecuted. At the least, the individuals involved had some elements of decency. This cannot be said of *Escobedo* and *Miranda*. Even after Escobedo was released by the Supreme Court after a conviction of murder, because he had not been allowed to consult a lawyer before making his confession, he continued his guerilla warfare against society and recently was convicted of trafficking in narcotics and poisonous dope and was sentenced to 22 years in prison. Ass't U. S. Attorney John J. McDonell, who prosecuted Escobedo, said: "Whether or not he has a gun in his hands or is selling dope, he is a killer."

The other "hero" is Ernest Miranda who in his own handwriting confessed to kidnapping and forcible rape. He was released by the U. S. Supreme Court because certain mystic words had not been pronounced by the police to him, although no one disputed that Miranda dipped a voluntary pen into a willing inkwell when he spelled out the details of his revolting misdeeds.

What happened to Miranda? He was tried again, incidentally, while serving a term for robbery, and convicted and sentenced to the Arizona State Penitentiary. These are the two outlaws and unsavory characters whose names now are held up as symbols of the purity of the law. And it is the decisions following the depredations of these two confessed, degenerate and convicted criminals which are fettering the police in their

efforts to protect law-abiding people from hoodlums, robbers, rapists and murderers.

Now, I am thoroughly aware that the evil character of the defendant in any given trial has nothing to do with the application of constitutional guarantees. The worst criminal in America is entitled to the most sacred protection under the Constitution, and I believe that I have demonstrated that I have fought for the upholding of that principle throughout my professional life. Among other ways, I evidenced this quite conclusively at the Nuremberg trials. Nevertheless, it is important that the public know the nature of the individual who is the subject of litigation when there are involved principles of law which can mold the future development of criminal law and procedure.

Throughout the country, commissions and boards are being appointed and assembled to inquire, to probe and to seek to determine the cause of the appalling crime rate in the United States. Despite the fact that America is the wealthiest nation in the world and that opportunity for education and economic security here are not surpassed anywhere on the globe, our streets have been rendered unsafe, homes are no longer castles of undisturbed sanctity, womanhood everywhere is endangered. Why?

Why are persons of criminal bent becoming bolder and more daring in defying law and order? Does the attitude of the courts in releasing confessed and proved criminals have something to do with encouraging crime, does this attitude help to give intending criminals a feeling that their chances of "beating the rap" are rather good in view of the continuing judicial red tape being bound around the police?*

---

\* Between 1960 and 1966 there were 355 policemen murdered. Of those arrested for the crimes, 76 per cent had previously been arrested on a criminal charge.

Very recently, in Philadelphia, a Ronald Hickey was acquitted of murder by a jury because the Commonwealth was not permitted to introduce into evidence his confession, both oral and written, in which he stated that he had gotten into a taxicab, ordered the driver to turn over his money and, when the driver refused, he stabbed him to death. The police did not tell Hickey, when he was apprehended, that he was entitled to have a lawyer and so, the Court, under the *Miranda* routine, suppressed Hickey's confession which had been made voluntarily and without any threat of punishment or promise of reward. This, incidentally, occurred before the *Miranda* decision was handed down but the Supreme Court held that the rules therein contained were retroactive in cases where the defendants had not yet been tried.

Retroactivity of the law, legislative or court-made, is abhorrent to American standards of fair play. Was it fair play to deny to society and to the relatives of the brutally-stabbed victim, the use of a confession which was freely given by the stabber?

A little over a year ago, in New York, a wholesale killer, José Suarez, stabbed to death his wife and five children and then freely confessed to his shocking deed. The Supreme Court had not yet handed down its *Miranda* decision, but, again, the miraculous formula for retroactive succor to murderers went into effect. The confession was suppressed and the trial court reluctantly released the confessed murderer whom the judge characterized as an "animal." This, of course, was a libel on the animal kingdom because no animal would do to its offspring what Suarez did to his.

In view of what is happening in the United States with regard to upholding law and order, a duty devolves upon judges to speak out in behalf of reality, so that Congress and the Legislatures may do some-

thing to stop the momentum of court legislation heading toward greater disregard for upholding the "domestic tranquillity" proclaimed in the Preamble to the Constitution of the United States.

Thus I believe that the legal profession and those who read the decisions of this Court should know what actually happened in the case at bar. The Majority Opinion merely states that "Lewis assaulted Turk severely, causing injuries which resulted in his death." These "injuries" which Lewis inflicted on his victim were of such a character that the trial court would not allow photographs of the deceased's body to be shown to the jury because of their inflammatory nature. Lewis's attack was directed toward George Turk's head and the autopsy showed that the victim's neck was broken, his vocal box smashed, and the wounds to the head were of such a nature that the brain was swollen and the face battered to a pulp. It would appear that the deceased struggled to defend himself because his hands showed evidence of severe abrasions.

While I know that the ferocity of the homicidal attack has no bearing on the legal issues involved, I believe it is well to know with what facts we have to deal in this case as we proceed to dispose of it jurisprudentially. It might be added that Banks' share of the money robbed from George Turk was two dollars!

It may be added also that when the police questioned Banks in the automobile as to the age of the victim, during the time Banks was feigning assistance to him, Banks replied: "This son-of-a-bitch is 80 if he's anything." Thus, after contributing to the man's death, Banks stood by to curse him, in addition. This is the nature of the malefactor to whom the Majority is tendering the gift of a new trial, in spite of his unrestricted admission of the homicidal part he played in the murder of the unoffending George Turk who had

just completed his day's work and was on his way home to enjoy the satisfaction of having completed an honest year's endeavors, because the savage robbery and murder was accomplished on New Year's Eve.

I repeat that even if Banks' crime could exceed, in criminal magnitude, those committed by Hitler, he is still entitled to the protection of the Constitution of the United States, but reasons should be given, which I fail to find in the Majority Opinion, as to why he should have a new trial when every opportunity was afforded him to prove his innocence, and to mitigate, if he could, the severity of his murderous deed. It was Banks himself who produced the evidence of his guilt, and it should be our duty to uphold, not knock down, that evidence which was produced and presented under every safeguard the law affords, even the lavish, de luxe protection generously offered by the Supreme Court of the United States to the Mirandas, Escobedos, Hickeys, and Suarezes.

In impeding the police in their serious job of solving crime and protecting society from criminals, the Supreme Court, by its arbitrary rules, has made of law enforcement a game to be played between the law enforcers and the law violators. The State courts, while bound by the decisions of the U. S. Supreme Court, should not expand that game and turn it into a farce. And that is what is being done in the case at bar.

Although the Majority Opinion admits that Banks was taken to the police station as a witness, it refuses to give full effect to that classification. If Banks entered the police station as a witness, why would the police have to tell him he did not have to reply to questions put to him? The police also took to the police station Otto Williams. In addition, they picked up a Mrs. Mary Davis as a witness. She had worked in the office with George Turk and it was she who called the

police after Turk had been assaulted, and she saw Turk and the defendant in the automobile. Would the Majority say that the police had to tell Otto Williams and Mary Davis that, before they spoke, they were entitled to have a lawyer? I repeat that Otto Williams, Mary Davis and *Ellis Banks* were all questioned as WITNESSES. They were not under police custodial investigation, of which we will have something more to say later on.

I am wondering whether the Majority has given this case the deliberation it requires. A horrible murder has been committed, there are witnesses to the killing, or to events preceding and following the homicide. Yet, the police, according to the Majority, are not to question persons possessed of information which will lead to detection of the murderer, unless they first play to these possessors of information the *Escobedo* and *Miranda* phonograph records.

From the very beginning, Banks said he was merely a bystander. Indeed, he was so convincing in his bystander role that he was released after questioning. It was only after the police discovered that he had lied about his place of employment that the police interrogated him about that place of employment. The police were trying to solve a brutal murder, they had to follow every thread of information which might lead to discovery of the murderer. The Banks thread broke in the middle, and so the police went to Banks to ask if he could splice the thread with more information. It was while Banks was endeavoring to fit another piece of thread to the broken one that he saw he was entangling himself and he *voluntarily* revealed he had formed part of the murder plot. Up until this time the police had no way of knowing Banks was anything other than a witness. Why should they have been re-

quired to crank up the Escobedo-Miranda talking machine?

The Majority Opinion goes into a learned dissertation on "police custodial interrogation," but this is merely indulging in fancy language. The police were doing what they were required to do, what they took an oath to do when commissioned as police officers, what they should and must do if people on the streets and in their homes are to be saved harmless from thugs, bandits, robbers, thieves and molesters.

What is "police custodial investigation"? If I witness an accident or a crime and the police request me to go to the police station to tell what I know about the event, it is my duty as a citizen to respond, just as I would want the police to question witnesses of an accident or holdup if I happened to be the victim.

The Majority makes a fetish of "police custodial investigation." So long as the police exert no force, and treat the witness fairly and decently as an American citizen must be treated, there is no infringement on constitutional rights. The *Escobedo* and *Miranda* landmarks and others in the same hinterland are based on the Fifth Amendment which says that no person "shall be compelled in any criminal case to be a witness against himself." It will be noted that the key word in this sentence is "compelled." And I repeat, to the point of monotony, that the evidence in this case conclusively establishes that Banks was not *compelled* to make any statement, directly or indirectly, nor was he offered any inducement to speak as he did.

. . While we are bound to follow the United States Supreme Court decisions, we have a duty also to use the brains and the conscience with which the Lord endowed us. We did not cringe before *Escobedo* and *Miranda* in the case of *Commonwealth v. Eperjesi*, 423 Pa. 455, where we held that when the defendant there,

who had not been accused of crime, blurted out to a policeman that she had closed the door on two tots in a refrigerator, her admission could be used in a trial against her. In principle, the case at bar does not differ from *Eperjesi*. When Banks was being questioned as a witness, the processes of the law had not shifted from investigatory to accusatory.

In its zeal to follow the *Escobedo* and *Miranda* decisions, with their labyrinthian ratiocinations, the Majority here should not lose sight of the United States Constitution as a whole. The U. S. Supreme Court, in laying down certain unworkable criteria in *Miranda* and *Escobedo*, may have overlooked the Ninth Amendment to the Constitution, which says that: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

One of those rights retained by the people is the assurance of "domestic tranquility." Certainly the people of any community cannot be assured tranquility, or even "the blessings of liberty," both proclaimed in the Preamble to the United States Constitution, if the police, in seeking to maintain domestic tranquility, are prevented from ferreting out crime and turning over to the courts those who, of their own volition, confess to crime.

The Majority brushes aside the position of the Commonwealth that up to the moment Banks first admitted his participation in the crime, he was being questioned as a witness and therefore there was no necessity to advise him that he could remain silent. The Commonwealth's contention in this regard is as sound as a proposition in Euclidean geometry, but the Majority treats it as an argumentative bubble. It says that "the appellation given the individual questioned is not controlling." But it is not a matter of appellation; it is

a proposition of solid fact. Banks never entered into the ambit of what the Majority delights in calling "police custodial interrogation." It uses that term as if it meant a solitary cell or a strait jacket. Banks, I reiterated, went to the police station as a witness just as Otto Williams and Miss Davis went. As already stated, Banks' explanation of what happened at the scene of the murder was so convincing that he was released *twice*. What was inhibitory about that, or even custodial?

It was only when Banks willingly, voluntarily, and of his own free will, announced that he had had a hand in the crime, that he entered into the precincts of that much-loved phrase of the Majority "police custodial interrogation," and it was when Banks passed into that purgatorial region that he was informed he did not need to make any statement, that he was entitled to a lawyer, etc., etc., etc., all according to the stuttering, squeaking, squawking *Escobedo-Miranda* phonograph record.

The Majority says that if the police are allowed to question people as witnesses, then the police can evade the encircling *Escobedo-Miranda* lariat by "interviewing everyone as 'a witness.'" This, with all the polish that the Majority puts into the phraseology, is still quibbling. Whether a person under questioning is a witness or a suspect is a matter of realistic ascertainment, not a matter of the sign the police, or this Court, may pin on him.

In addition to its illogicality, the Majority's statement that police would question everybody as witnesses is a gratuitous reflection on the honor and integrity of the police of Philadelphia and every community in Pennsylvania. What it suggests is that the police, having every reason to believe, that a certain person is a law violator, will call him as a witness in

order to trap him into a deprivation of his constitutional rights. This I regard as an unjust appraisal of the honor and integrity of police. Anyhow, it is not, as I have already stated, what the police term the person interrogated, it is what he says that determines whether he should listen to the *Escobedo-Miranda* graphophone.

But, above everything else in this case, it is as clear as a policeman's whistle that Banks was *not* under custodial investigation when he opened the bird's cage of his feigned noninvolvement and the black crow of his criminality flew out into the open.

The Majority admits that the courts in other states "have experienced difficulty in determining whether questioning under certain circumstances constitutes 'custodial interrogation.'" Since there is, therefore, admittedly this latitude of interpretation as to whether certain questioning constitutes "custodial interrogation", I should think that common sense, rather than stilted reasoning, should apply in interpreting the facts in this case.

The Majority says that Banks "had little or no freedom of choice" and that the situation was "inherently coercive." I can only regard this statement as fanciful. When and how was Banks deprived of his freedom of choice? Was he told he had to confess? Was he threatened? Wherein was Banks coerced? The Majority saying that Banks was in a coercive situation does not make it so.

In an attempt to lessen the ludicrousness of its statement that Banks was placed in a coercive situation, the Majority says that "'coercive' has no relationship to 'coercion.'" This is like saying that homicidal has no relation to homicide. What is *coercive* but an adjective describing a situation where coercion is employed? The Majority quotes for its authority for this

misuse of words, the University of Pittsburgh Law Review. I have examined the article cited by the Majority Opinion and I am compelled to say that the Majority does the author of the article an injustice in ascribing to him a definition which he never used. I would suggest that the Majority, instead of mis-citing the distinguished University of Pittsburgh Law Review, might improve its knowledge of words by consulting Webster's Dictionary which specifically defines *coercive* as "serving or intended to coerce."

And if the Majority suggests that Banks was coerced into making his statement, it does violence to both the dictionary and the transcript of the record.

As heretofore indicated, much is being said about the breakdown in law enforcement and much is being said about courts releasing criminals. That is exactly what is taking place here. Although the Majority is only ordering a new trial and not outrightly releasing Banks into the streets where he may prey on other innocent motorists, it is depriving the Commonwealth of its use of Banks' voluntary confession of guilt. With this confession out of the case, it may be there will not be enough evidence to convict Banks of the brutal crime which he, more than anyone else, knows he committed, because he voluntarily admitted he committed it. If Banks is not convicted at the new trial, this will be another deplorable case where the courts have, in the face of the clearest evidence of guilt, released a murderer into the streets to prey on innocent Americans, who, under the Declaration of Independence, are entitled to "life, liberty and the pursuit of happiness," and, under the Constitution, should be guaranteed by this Court to "domestic tranquility," and the "blessings of Liberty".