Commonwealth *v.* Brown, Appellant.

Argued September 10, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*John Packel,* Assistant Defender, with him *Elizabeth Langford Green* and *Melvin Dildine,* Assistant Defenders, and *Herman I. Pollock,* Defender, for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Robert Mozenter,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY JACOBS, J., November 14, 1968:

Appellant Aaron Brown was convicted of aggravated robbery on June 22, 1965, and sentenced to two to

five years imprisonment. On this appeal, which we allowed nunc pro tunc, he assigns as error the admission of his oral and written confessions into evidence at trial. The record discloses the following pertinent facts:

On the morning of December 14, 1964, a robbery occurred at the Patio Bar in West Philadelphia. Two days later, in response to an anonymous letter stating that "the three Brown brothers" may have been involved in the crime, two police officers were dispatched to the home of appellant's mother. On their second visit Brown was present. The officers told Brown that they would like to question him about the Patio Bar robbery and asked him to accompany them to the police station for that purpose. Brown agreed, and he and his wife were taken via police squad car to West Detective Division.[1]

Upon their arrival at about 8:00 p.m., Brown was separated from his wife and interrogated intermittently until about 9:50 p.m. During this period he repeatedly denied any knowledge of the robbery. Finally the officers confronted Brown with the letter accusing him of the robbery and questioned him about its contents. Appellant then asked, "What is going to happen to my wife?" The detectives replied: "If your wife is involved as you are involved she'll be arrested as an accessory." Brown repeated this question several times and finally said, "Well, she didn't have anything to do with it." He was then asked, "Does that mean that you did it?" Brown replied, "Absolutely." No warnings were given Brown prior to this incriminating admission, but immediately thereafter he was placed under arrest and advised of his right to coun-

---

[1] There is conflict in the officers' testimony as to whether appellant or his wife requested that she be permitted to accompany him to the station.

sel and his right to remain silent. At about 11:00 p.m., the detectives took an "official" written statement from the appellant which was later admitted into evidence over objection at trial.

Since the trial herein concluded on June 22, 1965, whether or not Brown's constitutional rights were violated at the time his statements were obtained must be determined in light of *Escobedo v. Illinois,* 378 U.S. 478 (1964). See *Commonwealth v. Jefferson,* 423 Pa. 541, 226 A. 2d 765 (1967); *Johnson v. New Jersey,* 384 U.S. 719 (1966). *Escobedo* requires that a person subject to police questioning be warned of the right to remain silent once "the adversary system" begins to operate. The Supreme Court spoke of the adversary system beginning when the questioning process shifted from the investigatory to the accusatory stage; that is, when it changed from a general inquiry into an unsolved crime to one which "focused" on a particular suspect for the purpose of eliciting a confession. Following the decision in *Escobedo,* however, the courts experienced considerable difficulty in determining the dividing line between the investigatory and accusatory stages of a police inquiry. See *Commonwealth v. Jefferson,* supra. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the court attempted to alleviate this difficulty by saying that an investigation has focused on an accused and the adversary system begins to operate when questioning is initiated of a person who "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* supra at 444.[2] Thus, under *Escobedo,* as explicated by *Miranda,* it is essential that before a person is subjected to police custodial interrogation he must at least be

___

[2] The *Miranda* court noted in its opinion that "This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused." 384 U.S. at 444 n.4.

warned of his right to remain silent. Otherwise the use at trial of any statements obtained during such questioning is not constitutionally permissible. See *Commonwealth v. Banks,* 429 Pa. 53, 239 A. 2d 416 (1968) ; *Commonwealth v. Jefferson,* supra.

The Commonwealth argues that the police were not required to warn Brown of his right to remain silent until after he had made the oral admission because prior to that time, Brown had not been arrested and the interrogation had not focused on him for the purpose of eliciting a confession. We cannot agree.

It is not necessary that an individual be formally arrested before an investigation focuses on him. As pointed out in *Commonwealth v. Jefferson,* supra, custodial interrogation of a suspect by the police is not limited to questioning that occurs after a formal arrest. "If this were not so, the police would need only to delay formal arrest . . . in order to circumvent the constitutional safeguards [*Escobedo*] dictates." *Commonwealth v. Sites,* 427 Pa. 486, 492, 235 A. 2d 387, 390 (1967).

Although the police officers' testimony repeatedly refers to Brown's status during the interrogation as that of a "suspect", the Commonwealth argues that the accusatory stage was reached only after the admission when "the investigation focused upon the appellant as the *primary* suspect." But *Escobedo* does not require the police to have focused on one suspect to the exclusion of all others for its safeguards to apply; the court spoke of an inquiry which "has begun to focus on a *particular* suspect. . . ." 378 U.S. 490. Our Supreme Court noted in *Commonwealth v. Banks,* 429 Pa. 53, 239 A. 2d 416 (1968), that "[t]he appellation given the individual questioned is not controlling. Otherwise the police could evade the procedural safeguards required by Escobedo . . . by interviewing everyone as

[a mere "suspect"]." Id. at 58, 239 A. 2d at 419. In this case, even if Brown was initially approached as a person who only might have had information about the felony, he was certainly transformed into a "suspect" or indeed a "primary suspect" at that point in the interrogation when he was confronted with a letter accusing him of the crime.

The Commonwealth contends further that Brown was not subject to "custodial" interrogation because he agreed to accompany the police officers to the station and because the officers were not prepared to force him to go if he did not so desire. True, the detectives testified that they did not give appellant the impression that he had to go with them. But neither did they inform him that he did not have to go. Our Supreme Court answered this argument in *Commonwealth v. Sites,* supra. Sites was requested to accompany the police from his father-in-law's home, where several people were present, to his own home for the purpose of questioning him about a crime. The court said: "True, he raised no vocal objection to this, but it would be quite unrealistic to believe that his actions were completely free of compulsion." Id. at 492, 235 A. 2d at 390-91.

In this case, Brown was taken from his mother's home, where members of his family were present, to the forbidding atmosphere of a police station. He and his pregnant wife were transported by squad car and separated when they reached headquarters. During the trip down and for at least 30 minutes after being confined in an interrogation room, Brown was not questioned about anything or even spoken to. Although not held strictly incommunicado, since he was permitted to see his wife for the purpose of getting cigarettes, Brown was kept in separate confinement for at least three hours. Such a situation possesses all the

requisites of "custody". What is condemned by *Escobedo* is the incriminating statement given by a suspect under the compulsive circumstances of an actual *or apprehended* restriction upon his freedom of movement. Whether Brown was actually free to refuse to go with the officers or to leave the station house once there is of no consequence. It cannot be persuasively argued that Brown was not led to believe that his freedom of action was restricted. If the stage was truly investigatory, why could not Brown have been informally questioned at home, in the squad car, or at least in his wife's presence?

Another factor to be considered in determining whether the accusatory stage has matured is whether the police have carried out "a process of interrogation that lends itself to eliciting incriminating statements." *Escobedo,* supra, at 491. The wording suggests that if the police resort to incommunicado interrogation, in which the dangers that a suspect may be unfairly induced to confess are great, *Escobedo* should apply even though the subjective intent of the interrogating officers cannot be proved. In this case, however, the use of psychological pressure and deception can be shown by the interrogating officer's own testimony.

At the beginning of the interrogation and for at least one hour thereafter Brown disclaimed any knowledge of the crime. Even after being shown the letter accusing him of the crime, a tactic described by the officer in his testimony as "the clincher", he continued to proclaim his innocence. But in response to appellant's question "What is going to happen to my wife?" the interrogators responded, "If your wife is involved as you are involved she'll be arrested as being an accessory." Appellant's incriminating admission followed. The officers testified that they had no evidence whatsoever linking Brown's wife to the crime, and further

that they had not mentioned her until appellant inquired. In response to defense counsel's question as to why the interrogators told Brown she could be arrested as an accessory, however, the officer testified that his intent was "to trick him." "We were using a number of tricks, too." Although the use of a trick which has no tendency to produce a false confession is a permissible weapon in the interrogator's arsenal, see *Commonwealth v. Baity,* 428 Pa. 306, 315-16, 237 A. 2d 172, 177-78 (1968), the admitted use of tricks in this case strongly demonstrates that a "process of interrogation which lends itself to eliciting incriminating statements" was being employed.

Further, following Brown's statement that his wife was not involved, the officers contrived a leading question designed to extract a statement: "Does that mean that you did it?" That this method of questioning had gone far beyond the types of threshold inquiries characteristic of the investigatory stage is indisputable.

As noted in *Commonwealth v. Banks,* 429 Pa. 53, 59, 239 A. 2d 416, 419 (1968), when "police questioning occurs under an atmosphere or circumstances which leave the individual questioned no freedom or choice and which are inherently coercive, this is 'custodial interrogation.' " In the case before us, all objective factors including the place, nature, and duration of the questioning indicate that the interrogation of Brown was in fact "custodial" and should not have been conducted without first warning him of his constitutional rights. Cf. *Commonwealth v. Sites,* supra; *Commonwealth v. Jefferson,* supra; *Commonwealth v. Eperjesi,* 423 Pa. 455, 224 A. 2d 216 (1966).

Following Brown's oral confession, he was immediately arrested and the record is clear that he was adequately advised of his right to remain silent and to the assistance of counsel. The interrogating offi-

cers then formulated the questions to be asked for the "official" typewritten statement which was taken about an hour after the oral admission. The question therefore becomes whether or not the written statement secured after Brown was advised of his rights and admitted in evidence was purged of its original illegality. See *Commonwealth v. Moody*, 429 Pa. 39, 239 A. 2d 409 (1968). As explained in *Commonwealth v. Banks*, supra, "a statement or confession made subsequent to another confession or incriminating admission obtained absent a required warning of constitutional rights may not be used as evidence, unless it is first established that the last statement or confession was not the exploitation of the original illegality and was obtained under circumstances sufficiently distinguishing to purge it of the original taint." Id. at 59, 239 A. 2d at 419.[3]

Under the circumstances of this case, we are not persuaded that the taint had been removed. "[T]he crucial factor is whether . . . the second confession is sufficiently removed in time, place and atmosphere that the court can be assured that the second confession was not a product of the same illegality that produced the first." *Commonwealth v. Moody*, supra at 50, 239 A. 2d at 415 (dissenting opinion). Certainly, it cannot here be contended that Brown's written statement was obtained under circumstances different from the compelling surroundings that produced his oral statement. The written statement was taken in the same room and within one hour of the oral admission. No time elapsed other than that required to give the warnings, formulate the "official" questions, and record

---

[3] See generally Comment, Scope of Taint under the Exclusionary Rule of the Fifth Amendment Privilege against Self-Incrimination, 114 U. Pa. L. Rev. 570 (1966).

the second statement on a typewriter. See *Commonwealth v. Banks*, supra.[4]

Brown's statements, oral and written, were constitutionally inadmissible. Therefore, judgments are reversed and a new trial granted.

---

[4] In *Banks*, the written statement was taken four hours after the previous oral admission. The court held that the taint of the original illegality had not been purged.