## Commonwealth v. Rossi

C.P. of Butler County, no. 94-1011.

*David Hepting,* for the Commonwealth.
*Alexander Lindsay* and *James Ecker,* for the defendant.

O'BRIEN, *J.,* January 20, 1995—Presently before the court are defendant's omnibus pretrial motions wherein defendant petitions the court: (I) for a change of venue or venire of defendant's criminal trial; (II) to allow individual voir dire; (III) to suppress various oral statements made by defendant during the course of a police investigation; (IV) to suppress evidence obtained in the search of defendant's vehicle, the victim's vehicle, and other photographic and physical evidence obtained during the course of the police investigation; and (V) to declare the prior testimony of the Commonwealth's witness, Sherri Rossi, incompetent due to the serious nature of her head injuries. For the following reasons, defendant's motion for a change of venue is denied; the motion for individual voir dire is granted; the motions to suppress defendant's oral statements, the physical evidence obtained during the search of both vehicles, as well as the photographic evidence obtained during the police investigation are denied; and finally, defendant's motion to declare Sherri Rossi's prior testimony incompetent is denied.

The court will address each of defendant's motions in the order in which they appear above.

I.

In order to grant a change of venue or venire, the court must conclude that the defendant cannot receive a fair and impartial trial in Butler County. (Pa.R.Crim.P. 312.) Defendant alleges that the pretrial publicity surrounding his case is extensive, prejudicial, and impairs his right to a fair trial. In support of this allegation, the defendant introduced numerous newspaper articles and televised news accounts, as well as the results of a tele-

phone opinion poll conducted by defendant in Butler County. This court finds that the pretrial media coverage presented by defendant does not meet the standard set forth in *Commonwealth v. Tedford,* 523 Pa. 305, 567 A.2d 303 (1989). *Tedford* requires pretrial publicity to be sensational and inflammatory, contain information relative to defendant's prior record or confession, and be derived from police or prosecution reports.

Extensive pretrial publicity does not necessarily preclude a fair trial. *Commonwealth v. Smith,* 290 Pa. Super. 33, 434 A.2d 115 (1981). Moreover, the possibility that prospective jurors may have ˙formed an opinion based on news accounts will not automatically mandate a change in venue. *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978). Instead, once pretrial publicity exists, the inquiry turns to the nature of the publicity and its effect on the community. The factors the court must consider in determining the nature of the publicity include (a) whether the pretrial publicity consisted of factual and objective articles, or, to the contrary, consisted of sensational, inflammatory and slanted articles demanding conviction; (b) whether the publicity revealed the accused's prior criminal record; (c) whether it referred to confessions or admissions; and (d) whether such information is the product of reports by the police and prosecutorial officers. *Casper, supra; Commonwealth v. Tedford, supra; Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973).

After careful review of the newspaper articles and televised video coverage of defendant's case, the court denies the motion for a change in venue. The extensive coverage

of the defendant's case appears to be factual and objective in nature.

The publicity in this case appears to document and report the factual circumstances, as known and stated by defendant, surrounding the beating of Sherri Rossi. The publicity does not mention a criminal record nor does it refer to a confession by defendant. Said publicity is neither inflammatory nor "slanted" so as to "demand conviction." To the contrary, the publicity has covered both sides of the controversy, including defendant's claim that he is innocent and that he is being framed by satanic cult members.

Defendant's opinion poll is not probative or indicative of whether the jury pool of Butler County has been tainted or poisoned by the media coverage of defendant's case. Counsel for defendant went to Butler County's data processing office and requested a random, computerized list of 100 Butler County voters and then attempted to contact each of them by telephone. Counsel was able to contact 28 of these 100 voters but only 26 of them answered a series of five predetermined questions. There was no expert testimony as to the validity of the design, methodology or results of this "opinion poll." By their nature, opinion polls are hearsay and subject to all of its fallacies. For these reasons the survey results were given little weight by the court in determining any alleged proof of pretrial prejudice. Moreover, the possibility that prospective jurors have formed an opinion as to the defendant's guilt or innocence—as the defendant alleges here—is not, in itself, a reason to change venue. *Casper, supra.*

The court is satisfied that the process of individual voir dire should adequately protect the defendant's right to a fair and impartial trial. In the event that individual voir dire is not successful in empaneling an impartial jury, the court may then implement the proper remedial measures necessary to guarantee and protect defendant's rights.

## II.

On January 10, 1995, with concurrence of counsel for the Commonwealth and defendant, this court granted defendant's motion for individual voir dire. Said motion was unopposed by the Commonwealth and this court deemed individual voir dire appropriate and adequate to protect defendant's right to an impartial jury.

## III.-IV.

On January 10, 1995, at the hearing on the suppression of evidence, various police personnel and Andre DeStefano, a friend of defendant, testified as follows: At approximately 6:30 p.m. on June 24, 1994 Sherri Rossi's body was discovered next to her vehicle after authorities were summoned to the scene of a "car accident." Almost one and one-half hours later, the police received a 911 emergency call from defendant, who had requested to use the phone at the residence of Shirley and Robert Beiber. During the 911 call, defendant stated that someone had killed his wife and tried to kill him. Upon arriving at the Beiber residence to investigate this report, the police found defendant, who was wearing only a pair of shorts and had a blanket draped over his shoulders, sitting in the living room. When asked at the Beiber residence what

had happened, defendant told the police that he and his wife, Sherri Rossi, were driving in separate cars looking at houses. Defendant, who was driving behind Mrs. Rossi, stopped and pulled into a private driveway. Mrs. Rossi therefore stopped and pulled to the side of the road. At this time, defendant said a man in a white car, who resembled him, forced his way into Mrs. Rossi's car via the passenger door. Defendant, leaving his own vehicle (which was equipped with a car phone), chased Mrs. Rossi's vehicle on foot. Defendant stated that her vehicle was forced off the road and that when he reached her car he saw his wife lying on the ground. Defendant assumed that his wife was dead. He said he was then touched and rubbed from behind by the attacker who told him to run or that he would be killed.[1] Defendant said that as he began to flee he heard two gunshots. Defendant further stated that after running through the woods for over an hour, where his shirt and shoes were lost due to the the force of his flight, he came upon the Beiber residence and summoned help. All of this information was given to police as part of their investigation prior to the defendant being advised of the *Miranda* warnings.

Shortly after the police arrived at the Beiber residence, a friend of defendant, Andre DeStefano, also arrived because defendant had called him. When defendant asked to speak privately with Mr. DeStefano, Corporal Harriett, the investigating officer in charge, told him that he would

---

1. According to the testimony of two police officers, defendant alleged that the touching and rubbing by the attacker was done to put the victim's blood on defendant's clothes to frame him. Defendant had consistently stated that satanic cult members were out to get him.

prefer to hear what defendant had to say because it was defendant who had summoned the police to investigate the attack and murder of his wife. Defendant and Mr. DeStefano went into the kitchen area and proceeded to have a conversation in the presence of Corporal Harriett.

Defendant was then asked if he would accompany the police to the location of his vehicle to describe what took place to the best of his recollection. Defendant agreed and was transported to his car in the back of a police vehicle along with Trooper Sims. During the trip, Corporal Harriett was radioed to immediately phone the station regarding his prior inquiry into whether Mrs. Rossi had been shot. Therefore, the police officer stopped at the Connoquenessing firehall to call the station. After a delay of approximately 10-15 minutes during which the defendant was engaged in conversation with Trooper Sims, he asked about his *Miranda* warnings. Defendant was told that only individuals who are under arrest need *Miranda* warnings and that he was not under arrest.

When the police and defendant arrived at the location of his car, defendant was asked to consent to a search of his vehicle. Defendant's friend, Mr. DeStefano, who was permitted to follow the police to the scene, encouraged defendant to cooperate. At this time, defendant asked "Do I need an attorney?" to which Corporal Harriett replied, "That is up to you." Defendant did *not* invoke his right to counsel but instead signed the consent to search form. Accordingly, his vehicle was searched.

At some point after the search of his vehicle, defendant changed his account of what transpired in the attack of

his wife. At the Beiber residence defendant had stated that a man from a white vehicle forced his way into the passenger side of Mrs. Rossi's vehicle. At the scene, however, defendant stated that a man who looked exactly like him "came out of nowhere" and forced his way into the driver's side of the victim's vehicle. Upon noting the discrepancy, Corporal Harriett told defendant that he believed defendant was not being truthful. It was at this time that defendant invoked his right to an attorney and all discussions ceased.

After invoking his right to counsel, defendant was taken into custody and transported to the police station. Defendant was also given his *Miranda* warnings. At the station, defendant's attorney was contacted and defendant was photographed. Defendant's shorts, visibly marked with blood, were also taken as evidence.

It is the defendant's position that all of the statements made by defendant, from the Beiber residence up to and including those made at the location of his vehicle, were made pursuant to a custodial interrogation in violation of defendant's rights. Accordingly, the defendant seeks to suppress all of defendant's oral statements on the theory that he wasn't given his *Miranda* rights. The defendant also seeks to suppress the physical evidence seized from defendant's and victim's vehicle, and the photographic evidence taken at the station under the "fruit of the poisonous tree" doctrine.

It is the Commonwealth's position that the defendant was not subject to custodial interrogation, but rather, as an individual who summoned the police to investigate the murder of his wife, was subject to on-the-scene ques-

tioning. According to the Commonwealth, this "questioning" of the defendant was investigatory—not accusatory—and therefore, *Miranda* rights were not required. Moreover, the Commonwealth points to the fact that the defendant was told by police officers that he was not under arrest and that when, in fact, defendant invoked his right to an attorney, all inquiries regarding the attempted murder of his wife ceased.

To begin the analysis on the issues of suppression, the court first turns to the definition of custodial interrogation. Custodial interrogation occurs when questioning is initiated by a law enforcement officer, after the person has been taken into custody or otherwise deprived of his freedom of action in any significant way, and questioning commences while the investigation focuses on the accused. *Miranda v. State of Arizona,* 86 S.Ct. 1602, 384 U.S. 436, 16 L.Ed.2d 694 (1966). However, the United States Supreme Court stated that its decision "[w]as not intended to hamper the traditional function of police officers in investigating crime ... General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" is not affected by the *Miranda* holding. *Miranda,* 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed. at 712.

In interpreting *Miranda,* Pennsylvania courts have ruled that warnings are necessary when an individual is physically deprived of his freedom or reasonably believes that his freedom of action or movement is restricted by interrogation. *Commonwealth v. Banks,* 429 Pa. 53, 239 A.2d 416 (1968). "Interrogation" has been held to mean

police questioning or conduct which is calculated to, expected to, or likely to evoke admissions. *Commonwealth v. Whitman,* 252 Pa. Super. 66, 380 A.2d 1284 (1977). From this definition it is clear that interrogation is not synonymous with on-the-scene questioning.

General on-the-scene questioning conducted to determine whether a crime has been committed is not custodial for *Miranda* purposes. Furthermore, it is not simply custody plus questioning which calls for the *Miranda* safeguards—what *is* required is custody plus conduct by a police officer that is calculated to, expected to, or likely to evoke admissions. *Commonwealth v. Kloch,* 230 Pa. Super. 563, 327 A.2d 375 (1974); *Commonwealth v. Hankins,* 293 Pa. Super. 341, 439 A.2d 142 (1981).

When assessing police conduct during detentions to determine whether they are custodial in nature, the court should look to a number of factors. Such factors include the basis for detention; the duration and location of the detention; whether the individual was transported against his or her will; the method of detention used by investigators; whether the investigators showed, threatened, or used force; whether the individual was the focus of the investigation; and finally whether the methods used to confirm or dispel suspicions were so coercive and deceptive that *Miranda* warnings would be required. *Commonwealth v. Ellis,* 379 Pa. Super. 337, 549 A.2d 1323 (1988), *app. denied,* 522 Pa. 601, 562 A.2d 824 (1989). This concept of considering the "totality of the circumstances" is important when assessing the need for *Miranda* warnings.

Applying the above rationale to the situation at bar, it is evident to the court that the defendant was not in police custody at the Beiber residence. It was defendant who called 911 summoning the police to report the "murder" of his wife. When the police arrived they asked defendant basic and general questions relating to the incident involving the attack. Defendant was the only available witness to answer such questions and according to the testimony of the investigating officer as well as defendant's friend, Andre DeStefano, defendant was very cooperative in helping the police gather all of the necessary information.

The atmosphere at the Beiber residence was not coercive and the on-the-scene investigative questions were not of the type likely to evoke admissions. Moreover, the defendant was not isolated or restricted in a significant way. To the contrary, defendant was questioned in the presence of Mr. and Mrs. Beiber and defendant's friend. These facts, as well as the above cited authorities clearly demonstrate that defendant was not subject to a custodial interrogation at the Beiber residence. Therefore the statements made by defendant at the said residence are admissible.

When defendant was transported in a police vehicle from the Beiber residence to the location of his vehicle to describe what had occurred, he was definitively told that he was *not* under arrest. Testimony of Trooper Sims and Trooper Katavich also established that at that time defendant was not the focus of the investigation. This court finds that defendant knowingly volunteered to go with the police and that defendant knew he was not under arrest. There was no evidence that defendant was coerced

or forced into going to the location of his vehicle. To the contrary, defendant stated that he wanted to help the investigation in any way he could. Defendant's situation is factually similar to that in *Commonwealth v. Foster,* 425 Pa. Super. 61, 64 A.2d 144 (1993), where the defendant was not entitled to suppress statements made to police even though no *Miranda* warnings were given because the defendant was not in custody. In *Foster,* the defendant, who was a potential witness to a murder, voluntarily went in a police vehicle to the station. Defendant was told he was not under arrest and the questioning atmosphere was not deemed coercive. *Foster, supra.*

As in *Foster,* this court finds that defendant was not in custody while he was being taken from the Beiber residence to the location of his vehicle. Accordingly, defendant's statements are admissible.

Assuming arguendo that defendant was in police custody during transport from the Beiber residence to the scene, it should be noted that the statements made during this time were the same or similar to what defendant said at the Beiber residence when he was clearly *not* in police custody. For this reason and for the fact that the police are permitted to temporarily detain an individual for the purpose of investigative questioning, this court finds that defendant was not in custody.

Once on the scene defendant was asked to consent to a search of his vehicle. At this time, defendant asked whether he needed an attorney. In response, Corporal Harriett told defendant that it was his (defendant's) decision. Defendant, however, did not invoke his right to counsel and subsequently consented to the search. Again, there

is no evidence of police coercion or force in obtaining the consent. To the contrary, defendant's friend Andre DeStefano testified that he spoke with defendant about the search and encouraged defendant to cooperate. Moreover, defendant's inquiry regarding his need for an attorney is not dispositive of whether defendant was in custody or whether all investigative questioning should have ceased. In *Davis v. U.S.,* the United States Supreme Court held that a similar statement made during investigative questioning ("maybe I should talk to a lawyer") is not an unequivocal request for counsel requiring the cessation of questioning. *Davis,* 129 L.Ed.2d 362, 114 S.Ct. 2351 (1994). Therefore, contrary to defendant's position, his inquiry is not equivalent to defendant asserting his right to counsel. As such, defendant's consent to search his vehicle is valid and any and all evidence seized is admissible.

Based on the above holding, defendant's arguments relating to the physical and photographic evidence obtained by the search of the vehicles and of defendant at the station are moot. Defendant alleges that said evidence is tainted under the "fruit of the poisonous tree" doctrine. Said doctrine holds that if evidence is seized in violation of defendant's rights it must be suppressed as does all other evidence derived from the illegality. See *Wong Sun v. U.S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Because this court has held that the defendant was not in custody, this argument has no merit. Once defendant invoked his right to counsel he was informed that he was in police custody. Proper procedure was implemented and defendant was handcuffed and transported to the station. At the station photographs of the defendant were taken, as were his shorts that had

visible traces of blood on them. Said items were in plain view and were seized incident to a lawful arrest. Accordingly, they are admissible.

## V.

The competency of a witness in a criminal proceeding is presumed. *Commonwealth v. Fultz,* 316 Pa. Super. 260, 462 A.2d 1340 (1983). The burden of showing a witness is incompetent is upon the party asserting the incompetency. *Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234 (1982). When determining competency of a witness, the court may consider whether the degree of capacity required for testimonially competent perception, recollection, and narration is proportionate to the complexity of the subject or event being testified to. *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974). Moreover, a witness is deemed competent if said witness has personal knowledge of the facts to which she is to testify; has the ability to perceive the event, remember it, and communicate it; and understands the obligation of an oath to tell the truth. *Commonwealth v. Tavares,* 382 Pa. Super. 317, 555 A.2d 199 (1989).

The defendant asks this court to declare Sherri Rossi's testimony before District Magistrate Wise and Judge Thomas Doerr, wherein she unequivocally identifies defendant as her attacker, as incompetent because she now contends to have a better memory of what transpired on the evening of June 24, 1994. The defendant alleges that Mrs. Rossi's earlier, incriminating testimony is incompetent due to the serious nature of her head injuries. To support this position, defendant offered into evidence literature prepared by Mrs. Rossi's rehabilitation institute

and given to her as a care guide. Said literature describes the various steps and stages of recovery an individual must go through after receiving a serious head injury. This care guide, however, does not satisfy the burden the defendant must meet to prove incompetency; it merely sets forth a typical head injury patient's steps to recovery.

The defendant has not demonstrated that Mrs. Rossi lacked personal knowledge of what she testified to, nor have they proven that she was incapable of perceiving and remembering what occurred. Moreover, applying *Ware* and *Tavares, supra,* the court concludes that Mrs. Rossi was competent to testify about the identity of her attacker. It is clear from the transcript of Mrs. Rossi's testimony that she voluntarily identified the defendant under oath and understood the significance of telling the truth. The credibility and weight given to her testimony is a matter for the jury. Accordingly, defendant's motion to declare said testimony incompetent is denied.

## ORDER

And now, January 20, 1995, upon consideration of the testimony, the arguments and counsel's briefs on the issues raised in defendant's omnibus pretrial motion and for the reasons stated in the within memorandum opinion, the court hereby: (I) denies the petition to change venue or venire; (II) grants the motion for individual voir dire; (III) denies the motion for suppression of defendant's statements made at the Beiber residence; (IV) denies the motion for suppression of the physical and photographic evidence obtained from the defendant's vehicle and defendant's person; and (V) denies the motion to declare the Commonwealth's witness, Mrs. Rossi, incompetent.