William James EVANS, Appellant,

v.

UNITED STATES of America, Appellee.

George William BRUTON, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18489, 18490.

United States Court of Appeals
Eighth Circuit.

March 22, 1967.

**356**

Irving L. Cooper, Clayton, Mo., for appellant William James Evans.

Daniel P. Reardon, Jr., St. Louis, Mo., for appellant George William Bruton.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., for appellee. Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., with him on the brief.

Before MATTHES, LAY and HEANEY, Circuit Judges.

MATTHES, Circuit Judge.

William James Evans and George William Bruton were jointly indicted, tried and convicted by a jury of violating 18 U.S.C. § 2114 (1948).[1] Following the entry of judgment imposing the mandatory sentence of twenty-five years they duly perfected their appeals to this Court.

■ The focal and crucial point both in the district court and on appeal is the admissibility into evidence of two oral confessions made by the defendant Evans. Both confessions were made prior to Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (June 13, 1966). Trial, however, commenced on June 20, 1966; hence *Miranda* is applicable and controlling. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (June 20, 1966).

We first give attention to the offense which was established by uncontradicted evidence.[2]

Paul J. Robinson operated a jewelry store and watch repair shop on South Kingshighway in St. Louis, Missouri. His place of business was also a contract station or branch for the United States Post Office Department, and postal services were offered to the general public. Miss Shirley Miller was, on the date in question, and had been for some time prior thereto, an employee in the store and contract station. At approximately 2:00 P.M. on Good Friday, April 16, 1965 two Negro men entered the establishment and while Miss Miller was waiting on them each drew a gun, pointed it towards Miss Miller, and ordered her to the rear of the premises. Robinson was working in the store behind a partition. He was nevertheless able to see and observe the men through a small window in the partition. Both Robinson and Miss Miller were commanded by their assailants, at gunpoint, to lie on the floor face down behind the partition. Their legs and arms were bound. Glass showcases were broken and a safe containing Government property was opened. Various articles of merchandise and more than thirty dollars in Government money were taken by the robbers. The victims later were able to free themselves and report the holdup to the police.

Robinson's place of business was located in an area occupied almost exclusively by white persons and was infrequently patronized by Negroes. Miss Miller testified that the individual identified as defendant Evans had been in the store about eight times during the period of a year and one-half prior to the offense. Robinson stated he had sold Evans stamps on the Monday prior to the holdup. In this setting both Robinson and Miss Miller had no difficulty whatever in promptly and positively identifying Evans on April 8, 1966, when they viewed him in a line-up at the St. Louis Police Headquarters. Only Miss Miller, however, identified Bruton in a later line-up conducted on April 25, 1966. Robinson, "who just saw him [Bruton] come in" and did not see him again while the robbery was in progress, was unable to positively identify Bruton.

■ At the threshold of the trial the court conducted a hearing out of the presence of the jury for the purpose of determining the voluntariness of certain incriminating statements elicited from Evans during a police interrogation. This procedure comports with the rule prescribed in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Evans also objected to the admissibility

---

1. 18 U.S.C. § 2114 (1948) provides in pertinent part:
 "Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin [the same] * * * or robs any such person of mail matter, or of any money, or other property of the United States, * * * or puts his life in jeopardy by the use of a dangerous weapon, * * * shall be imprisoned twenty-five years."

2. Neither defendant testified nor offered any evidence during the trial.

of his incriminating statements during the course of the trial.

██ The preliminary hearing conducted by the court revealed that Evans was arrested on March 22, 1966 and detained for a period of nearly two weeks prior to the first interrogation by local officials. At police headquarters, on April 4, 1966, Detective Oscar Farmer, of the St. Louis Metropolitan Police Department interrogated Evans in general about various robberies in the city, but did not specifically question him as to his participation in the Robinson postal robbery. He testified that prior to the interrogation he advised Evans only of his right to have an attorney and was informed by Evans that an attorney already represented him.[3]

██ Farmer continued his interrogation of Evans on April 8, 1966 after Evans had been positively identified by Robinson and Miss Miller as one of the participants in the postal robbery. Concededly, no warning of any type was given to Evans on this date. Evans repeatedly denied involvement in the robbery during the first two interrogation sessions conducted on the 8th, the second of which transpired in the presence of Miss Miller and Robinson. Evans, however, finally admitted his participation during the third period of questioning later that day. Only subsequent to these admissions did Farmer discuss with Evans the possibilities of dropping current state charges involving a Western Union robbery in favor of Federal prosecution. The record is totally silent as to the manner of interrogation, and consequently, we do not infer that Evans' confession was a product of his own voluntary purge of conscience rather than the result of Farmer's psychological pressure during the repeated interrogations.

Following Evans' admissions on the 8th, Farmer contacted J. B. Thorn, a United States Postal Inspector, who subsequently conducted his own interrogation of Evans in the city jail on April 11, 1966 in the presence of Farmer. Farmer admittedly revealed to Thorn prior to this date the fact that Evans had confessed his role in the crime during the April 8th interrogation and that he had been positively identified by Robinson and Miss Miller. The inference is clear that Farmer desired Evans to reiterate his former admissions of guilt in the presence of Thorn and himself. Thorn's questioning focused specifically on the robbery of the postal station. His testimony, however, corroborated in substance by Farmer, indicated that he gave Evans the following preliminary warning:

> "I told him that he was a suspect in this matter, that he was not required to give any statements, in fact, he was not required to talk to me, that any statements he gave could be used against him in a court of law, and that he further had the right to an attorney."

The discussion between Thorn and Evans then centered on whether Evans was presently represented by counsel. Evans then named his attorney, but in Thorn's opinion gave no indication that he wished to consult with him prior to being interrogated. Thorn's testimony, categorically denied by Evans during the preliminary hearing, indicated Evans' apparent willingness to submit to the interrogation process without the assistance of counsel:

> "* * * Mr. Evans stated that Mr. Harris [Evans' attorney] was coming to see him on that particular day. I asked him if he would rather that I wait until Mr. Harris came to the City Jail. He stated no, that we could talk and that he would give Mr. Harris the information."

3. Neither party attempted to elaborate as to the nature of the warning given to Evans on April 4th. Notwithstanding the fact that Evans explicitly denied the existence of any such warning on that date, we nevertheless feel justified in concluding that the warning in its limited form fell far short of the constitutional standards set forth in *Miranda*, supra.

The Thorn interrogation of April 11th similarly culminated in Evans' admission that he was implicated in the robbery of the postal contract station. Thorn and Farmer again discussed the possibilities of dropping state charges in favor of a Federal prosecution. Although the record appears somewhat ambiguous as to exactly what point in time this discussion took place, Thorn did testify that he believed it transpired subsequent to the time Evans implicated himself in the robbery.

A complaint was filed on April 11, 1966 with the United States Commissioner charging Evans with robbery of the postal contract station. A warrant of arrest was issued by the Commissioner on the same day, but was not executed until May 3rd, the day after the state charges against Evans were dropped and he was released from state custody. Pursuant to Rule 5(a), Fed.R.Crim.P., Evans was brought before the United States Commissioner on May 3, 1966, at which time it is agreed he was fully advised as to his rights. At Evans' request the case was continued until May 10, 1966. On May 11, 1966 the indictment under which Evans and Bruton were tried was returned and filed with the district court.

On May 4th, Thorn conducted a subsequent interrogation of Evans. This interview likewise proved fruitful in that Evans again described his participation in the robbery in some detail and implicated Bruton as his accomplice.

At the conclusion of the hearing on the motion to suppress, the district court was of the opinion that the failure of Detective Farmer to advise Evans of his rights on April 8th, prior to the confession obtained by Farmer, was totally irrelevant. The only reason expressed by the court for permitting the confession to be introduced was the following:

"I think Mr. Thorn advised him of his rights, and as to what he told Mr. Thorn at that time, I think it's admissible. Not getting back into what he may have told Farmer at some other time, because that doesn't have anything to do with it."

In addition the record fails to disclose any finding that Evans had knowingly and intelligently waived the right to have his attorney present during the interrogation by Thorn. An essential element of voluntariness is an effective waiver by the accused of his right to retained or appointed counsel. As *Miranda* teaches:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we re-assert these standards as applied to in-custody interrogation." 384 U.S. at 475, 86 S.Ct. at 1628.

It is doubtful, moreover, whether the court's limited finding in regard to the issue of voluntariness meets the test promulgated in Jackson v. Denno:

"Where pure factual considerations are an important ingredient, which is true in the usual case, appellate review in this Court is, as a practical matter, an inadequate substitute for a full and reliable determination of the voluntariness issue in the trial court and the trial court's determination, pro tanto, takes on an increasing finality. The procedures used in the trial court * * * must, therefore, be fully adequate to insure a *reliable and clear-cut determination* of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." (Emphasis supplied). 378 U.S. at 390-391, 84 S.Ct. at 1788. See also Sims v. State of Georgia, 385

U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (January 23, 1967).

■ In summary, the district court was required to make a finding on the record with "unmistakable clarity" that (1) the *Miranda* warnings were given; (2) the defendant knowingly and intelligently waived his privilege against self-incrimination (see 384 U.S. at 475, 86 S.Ct. 1602); (3) the defendant voluntarily, knowingly and intelligently waived his right to have retained or appointed counsel present at the interrogation; (4) the confession or statement was freely and voluntarily made.

But quite apart from the inadequacy of the court's findings, for reasons stated below, we believe the confessions obtained by Thorn are invalid as a matter of law and should not have been admitted into evidence.

In reaching this decision we are mindful that the pivotal question is whether the circumstances attending Evans' detention by the local police and his confession of April 8th, prior to any warning of his right to remain silent, bring this case within the teachings of Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a companion case to *Miranda,* where the Supreme Court struck down a confession given to the F.B.I. authorities following an interrogation by local officials.

There is present in this case one circumstance, absent in *Westover,* which militates in favor of the validity of the confessions which were received into evidence. There was a lapse of three days between the time Detective Farmer obtained the concededly invalid confession (April 8th) and the time Inspector Thorn, after proper warning, obtained the second confession (April 11th). In *Westover* the interrogation by the F.B.I. began immediately after the interrogation by the local officers had ceased. The Supreme Court viewed this as a "continuous period of questioning", the effect being that the defendant was not adequately warned of his right against self-incrimination until the very end of the interrogation process.

The Supreme Court in *Westover* noted, however, that a different result would have been warranted if the "accused were taken into custody by the second authority, removed *both in time and place* from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." (Emphasis supplied). 384 U.S. at 496, 86 S.Ct. at 1639.

■ The interval of three days may be sufficient to warrant a finding that Evans had been "removed in time * * from his original surroundings" when he was questioned by Inspector Thorn, but he was clearly still in the custody of local authorities during Thorn's interrogation. This fact, together with Farmer's continuous presence during the interrogation of April 11th, prevented the effective removal of Evans from his original surroundings.[4]

There are other compelling circumstances which militate against the validity of the confessions. Evans had been detained in jail continuously for a period of two weeks and three days (March 22nd to April 8th) and, absent any warnings of his rights, had been subjected to at least three interrogations by local officers before he finally confessed to Farmer. He had been a prisoner two weeks and six days before he was adequately advised of his rights. More significant, however, in our view is the circumstance, not present in *Westover,* that Evans had made his inculpatory statements prior to his confrontation with Federal authorities on April 11th. Thus, at the time the warnings were given and the confession relied upon by the Government was obtained, Evans had already fully revealed

---

4. Evans was interrogated by Farmer when the first confession was obtained at the police headquarters. He was again interrogated by Thorn in the presence of Farmer at the city jail. This difference was not meaningful. Evans was on both occasions a prisoner and the atmosphere on April 11th was no different than it was on April 8th.

his involvement in the robbery. As Justice Jackson aptly stated in United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947):

> "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first." 331 U.S. at 540, 67 S.Ct. at 1398.

We have studiously pondered the question before us and cannot escape the conclusion that the Federal authorities were, under the teachings of *Westover*, "the beneficiaries of the pressure applied by the local in-custody interrogation." Of course, if Evans had been timely and fully apprised by the local officers of his constitutional right to remain silent in accordance with the rules promulgated by *Miranda*, the incriminating statements later given to Thorn would be invulnerable to constitutional attack.

While we cannot escape the feeling that there was independent, corroborating evidence which strongly suggested the guilt of Evans, we are nevertheless mindful of the Supreme Court's observation in *Miranda*, supra:

> "Dealing as we do here with constitutional standards in relation to statements made, the existence of independent corroborating evidence produced at trial is, of course, irrelevant to our decisions." 384 U.S. note 52, at 481, 86 S.Ct. at 1631. See also Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).[5]

The totality of the circumstances impel us to hold that the confessions before the jury were tainted and infected by the poison of the prior, concededly unconstitutional confession obtained by the local officer. Our decision, however, is limited to the facts before us and should not be interpreted as a per se rule that would prevent law enforcement officers of one jurisdiction from interrogating an individual who has been detained and questioned by other authorities for a period of time without appropriate warnings. The Supreme Court has stated as much in *Westover*, 384 U.S. at 496, 86 S.Ct. 1602. Questions of this nature must be decided on an ad hoc basis. On this record we hold that there was a causal relationship between the unconstitutional confession and the later incriminating statements which were imparted to the jury. This being the situation, a reversal of Evans' conviction is required.

We affirm Bruton's conviction. It should be noted that this defendant at no time moved for a severance as authorized by Rule 14, Fed.R.Crim.P. Perhaps Bruton proceeded on the theory that it was to his tactical advantage to be tried jointly, inasmuch as the evidence relating to his identification was weaker than that pertaining to Evans, and for the additional reason that the confessions were admitted solely as evidence against Evans. Be that as it may, the question is now presented whether Bruton's rights were prejudiced by admission of the invalid statements hereinabove discussed.

The district court in its instructions, to which no exception was taken, explicitly limited the purpose and effect of the incriminating statements made by Evans.[6] The rule is firmly es-

---

5. In view of the cogent, independent evidence against Evans and in light of the teachings of *Miranda*, we are caused to wonder why the Government prosecutor offered the statements as evidence.

6. After the Government had rested, the court cautioned the jury as follows:
 > "Gentlemen of the jury, I would like to say to you at this time yesterday there was testimony here with respect to a statement made by the defendant Evans to Thorn, the Postal Inspector, in the presence of, at least in one instance, in the presence of the Detective Farmer, and some reference to a second statement that was made only in the presence of Thorn. That statement, which I will instruct you about in the

tablished that in a joint trial, an incriminating statement made by one defendant which would implicate another defendant is admissible into evidence only against the declarant. The corollary of this rule is that the admission into evidence of a co-defendant's statement, under proper cautionary and limiting instructions, will not necessarily require a reversal of the conviction of the other defendant. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Haggard v. United States, 369 F.2d 968, 975 (8th Cir. 1966); United States v. Gardner, 347 F.2d 405, 406–407 (7th Cir. 1965), cert. denied, 382 U.S. 1015, 86 S.Ct. 626, 15 L.Ed.2d 529 (1966). As we have noted, the effect of Evans' incriminating statements and the purpose for which they were admitted were outlined to the jury on two occasions in clear, concise and understandable language. The court carefully confined the scope of the statements. To overturn Bruton's conviction we would be required to speculate that the jury, presumably composed of prudent and intelligent men, disregarded the court's instructions and their oaths. The Supreme Court has expressed similar sentiments in dealing with this very question:

"To say that the jury might have been confused amounts to nothing more than an unfounded speculation

instructions, if used, can only be used against the defendant Evans. It is hearsay insofar as the defendant George William Bruton is concerned, and you are not to consider it in any respect with respect to the defendant Bruton, because insofar as he is concerned it is hearsay."

In its formal charge to the jury the court again instructed:

"A confession made outside of court by one defendant may not be considered as evidence against the other defendant, who was not present and in no way a party to the confession. Therefore, if you find that a confession was in fact voluntarily and intentionally made by the defendant Evans, you should consider it as evidence in the case against Evans, but you must not consider it, and should disregard it, in considering the evidence in the case against the defendant Bruton.

that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions." Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

See also Delli Paoli v. United States, supra, 352 U.S. at 242, 77 S.Ct. 294, and Golliher v. United States, 362 F.2d 594 (8th Cir. 1966), where we stated:

"We must assume the jury was capable of assessing the evidence and followed the instructions of the court as they are bound to do by their oath." 362 F.2d at 603.

The evidence designed to establish Bruton's guilt, wholly apart from Evans' statements, is, in our view, necessarily a factor to be considered in determining whether there is a sound basis for deciding that admission of the statements into evidence did not affect the substantial rights of Bruton.

 Inasmuch as Bruton challenges the sufficiency of the evidence to sustain his conviction, we have carefully analyzed the evidence against him.[7] The fact question before the jury turned on the identification of Bruton. Although this important element was established by only one of the victims, Miss Miller, her uncontradicted testimony pro-

\* \* \* \* \*

It is your duty to give separate, personal consideration to the cause of each individual defendant. When you do so, you should analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant. Each defendant is entitled to have his case determined from his own acts and statements and the other evidence in the case which may be applicable to him."

7. As the reviewing Court, we have considered the independent evidence of Bruton's guilt in the light most favorable to the Government. Beatrice Foods Co. v. United States, 312 F.2d 29, 40 (8th Cir. 1963), cert. denied, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963).

vided the jury with convincing proof of Bruton's participation in the crime.[8]

We need not recount in detail Miss Miller's testimony relating to this aspect of the case. It is sufficient to say that after her face to face encounter with Bruton during the holdup, she was able to positively identify him at the police line-up on April 25, 1966 and again at the trial.

In summary, we are convinced (1) that there was substantial, independent evidence of Bruton's guilt; (2) that the court's instructions to the jury provided Bruton with sufficient protection so that the admission of Evans' statements, strictly limited to use against Evans, did not work to the prejudice of Bruton.

The judgment of conviction against Evans is reversed and the cause is remanded for another trial. The judgment of conviction against Bruton is affirmed.

---

8. A perceptible characteristic of Bruton was a "bad" eye. This was observed by Miss Miller during the holdup.