Commonwealth *v.* Mitchell, Appellant.

Argued December 1, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Joseph Alessandroni, Jr.,* with him *Abraham J. Brem Levy,* for appellant.

*Arlen Specter,* District Attorney, with him *Louis A. Perez, Jr.* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney,

and *Richard A. Sprague,* First Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, December 20, 1971:

On May 9, 1968, the appellant, Frank Joseph Mitchell, was convicted by a jury in Philadelphia of murder in the first degree and punishment was fixed at life imprisonment. From the judgment of sentence, this appeal was filed.

The first question presented is whether incriminating oral admissions and a written confession given by Mitchell to the police which were introduced over objection against him at trial were obtained through methods violative of the precepts established by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).[1]

The record discloses the following pertinent facts.

About 2:15 p.m., Saturday, October 15, 1966, the body of Doris Shenk, age fifteen years, was discovered in a vacant house on East Boston Street in the Kensington area of Philadelphia. Evidence indicated she had been sexually assaulted and the cause of death was forced strangulation. Through investigation, the police learned the identity of five youths (three girls and two boys) who had been with Miss Shenk on the night of October 13th. Upon questioning these girls, the police were informed that immediately after the girls and Miss Shenk parted company, she walked in the direction of East Boston Street accompanied by Mitchell and one Thomas Burns. The police then questioned Burns and learned he had departed from the two in the area of the house where Miss Shenk's body was found. In seeking out Mitchell for questioning, it was learned that he

---

[1] A pretrial motion to suppress this evidence was denied after an evidentiary hearing. An additional hearing was held immediately before the trial commenced and again suppression was refused.

was visiting relatives with Walter Robert Wiggins, an uncle, in Aston, Pennsylvania, so about 10:15 p.m., three Philadelphia police detectives were dispatched to this community (about one hour's drive from Philadelphia) to bring Mitchell back to Philadelphia.

Upon reaching the residence in Aston where Mitchell was visiting, the police asked him to return to Philadelphia to clear up some questions about his drinking with Miss Shenk. He was not informed of his constitutional rights or that the police intended to question him about a homicide, or that he did not have to accompany the police if he chose not to do so.

Mitchell agreed to accompany the police, and his uncle also joined them. During the trip the police asked Mitchell the following questions without advising him of his "Miranda" rights: (1) Are you Frank Mitchell? (2) Do you know Doris Shenk? (3) Were you with her on Thursday night? (4) Were you drinking with her?

To each question, Mitchell answered, "Yes". No further questioning then ensued.

Upon arriving in Philadelphia about 12:55 a.m., on October 16th, Mitchell was taken to the police administration building and placed in an interrogation room. Before any questioning commenced, he was advised of his rights, as required by "Miranda", and was also told that he was suspected of killing Miss Shenk. Initially, Mitchell said he "had not done anything", but after about fifteen minutes of questioning by police detectives, other than those who accompanied him from Aston, he admitted he killed Miss Shenk, but also said "that he did not mean it". Shortly thereafter, his answers to specific questions about how the killing occurred were recorded on a typewriter. At this time, Mitchell was nineteen years of age and without legal counsel or other assistance. Evidentiary use of the oral

admissions and the formal typewritten statement at trial are the basis of the assignment of error under discussion.

It is the position of appellant that the questioning which occurred in the police car during the trip from Aston to Philadelphia constituted custodial interrogation, and since he was not warned of his constitutional rights or the fact that he was under investigation for a homicide before this particular questioning occurred, evidentiary use of any statements he made thereafter was constitutionally proscribed. The Commonwealth urges that at the time Mitchell was being brought back to Philadelphia, on the basis of the information they then had, the police officers who accompanied him were justifiably of the opinion that he was sought as a witness and not as a suspect in the killing, hence the questioning at that time did not constitute "custodial interrogation". For the purposes of this opinion, these contentions need not be resolved. But, see *Commonwealth v. Marabel,* 445 Pa. 435, 283 A. 2d 285 (1971).

As we pointed out in *Commonwealth v. Frazier,* 443 Pa. 178, 279 A. 2d 33 (1971), evidence of incriminating statements made by an accused after he has been fully advised of his constitutional rights is not rendered inadmissible ipso facto because he made earlier incriminating statements during police questioning in the absence of an awareness of these rights. See also *Commonwealth v. Moody,* 429 Pa. 39, 239 A. 2d 409 (1968), and *Westover v. United States,* 384 U.S. 436, 86 S. Ct. 1602 (1966). However, in such a situation for the evidence of the subsequent incriminating statement to be admissible at trial, the Commonwealth must first establish that the last statement or statements were not the exploitation of the original illegality and were obtained under circumstances sufficiently distinguishable to purge them of the original taint. *Commonwealth v.*

*Banks,* 429 Pa. 53, 239 A. 2d 416 (1968). We conclude this is such a case.

Viewing the situation realistically, we do not think it can be reasonably disputed that Mitchell's admissions to the police during the trip from Aston to Philadelphia weighed heavily on his mind during the second period of questioning. However, assuming that the police should have given him warnings of constitutional rights before the initial questions were asked, in determining if the subsequent police questioning was tainted by the first questioning, the totality of the circumstances must be evaluated. Considering all of the circumstances, we are persuaded that the challenged oral admissions and typewritten statement were obtained under circumstances sufficiently distinguishable to purge them of the original illegality if such in fact existed.

When the questioning commenced in Philadelphia, Mitchell did not evidence any psychological disadvantage as indicated by his initial insistence that "he had not done anything". The officers who questioned him on the trip from Aston were not involved in his questioning and, moreover, there was a distinct break in the stream of events, particularly as to time and place. And most importantly, complete warnings of his constitutional rights were given before this questioning began so that Mitchell had ample opportunity to exercise his right to remain silent to protect himself since up to this point the police had gained nothing so damaging that there was no longer a need on Mitchell's part to remain silent. Cf. *Commonwealth v. Ware,* 438 Pa. 517, 265 A. 2d 790 (1970).

Mitchell also suggests that his incriminating statements should not have been admitted at trial, because after he had orally admitted he killed Miss Shenk, the record discloses that the interrogating police officer said to him, "I don't believe that you intended or planned

and schemed and had malice aforethought to kill this girl." It is urged that this rendered the subsequent formal recorded statement an involuntary act in that it misled Mitchell to believe the police concurred in his explanation that he did not kill Miss Shenk intentionally. A mere friendly attitude on the part of police questioners does not render an incriminating statement involuntary. *Commonwealth v. Willman,* 434 Pa. 489, 255 A. 2d 534 (1969). While the statement of the interrogating officer here involved may have been something more than "a mere friendly attitude", we are not convinced that it induced the subsequent formal statement. Before this observation was made by the interrogating officer, Mitchell had already admitted the killing with the explanation, "that he did not mean it". It was also made after complete constitutional warnings had been given and Mitchell had been warned a homicide prompted the questioning. Moreover, we are not persuaded that the officer's statement, when viewed in context, misled Mitchell into believing that he would be leniently dealt with or the police were willing to bargain with him if he confessed, or that it affected his "knowing, intelligent and voluntary waiver" of his rights, or his understanding that the charge against him was murder. Cf. *Frazier v. Cupp,* 394 U.S. 731, 89 S. Ct. 1420 (1969), and *Commonwealth v. Baity,* 428 Pa. 306, 237 A. 2d 172 (1968).

Appellant next complains due process was violated because the trial court excused for cause certain jurors who during voir dire examination voiced conscientious scruples against the imposition of the death penalty in the proper case. This same argument was considered and rejected by this Court in *Commonwealth v. Roach,* 444 Pa. 368, 282 A. 2d 382 (1971), and we stand on that decision. See also, *Commonwealth v. Speller,* 445 Pa. 32, 282 A. 2d 26 (1971); *Bumper v. North Carolina,*

391 U.S. 543, 88 S. Ct. 1788 (1968) ; and *McGautha v. California*, 402 U.S. 183, 91 S. Ct. 1454 (1971).

Appellant next argues that reversible error was committed when the judge failed to stop the prosecuting attorney from using a photograph of the deceased, taken after an autopsy had been performed, for identification purposes. The photograph in question was not shown to the jury or put in evidence, thus it could not inflame the jury directly, however, appellant argues that this effect was obtained indirectly because upon showing the photograph to a witness she broke down on the stand.

The case law relating to the use of photographs as evidence, indicates the following principles and guidelines.

First, in a murder trial the admission of photographs of the victim is largely within the discretion of the trial judge, see *Commonwealth v. Dickerson*, 406 Pa. 102, 176 A. 2d 421 (1962). See also *Commonwealth v. Robinson*, 433 Pa. 88, 249 A. 2d 536 (1969) ; *Commonwealth v. Wilson*, 431 Pa. 21, 244 A. 2d 734 (1968) ; *Commonwealth v. Powell*, 428 Pa. 275, 241 A. 2d 119 (1968), and unless there is a flagrant abuse of discretion an appellate court will not deem it reversible error. *Commonwealth v. Chasten*, 443 Pa. 29, 275 A. 2d 305 (1971) ; *Commonwealth v. Collins*, 440 Pa. 368, 269 A. 2d 882 (1970). Secondly, the fact that a photograph is gruesome is not sufficient legal reason in and of itself to exclude it. See *Commonwealth v. Chasten*, supra; *Commonwealth v. Capps*, 382 Pa. 72, 114 A. 2d 338 (1955). There is no showing on the record that this photograph was gruesome; nor is there any showing on the record of any misuse or overuse of this photograph. See *Commonwealth v. Dickerson*, supra. Lastly, the use of this photograph did have a purpose, i.e., identifica-

tion of the victim, thus, it did serve an evidentiary purpose. See *Commonwealth v. Collins,* supra.

Although the district attorney could have found a more appropriate means for identification, we are not convinced appellant suffered harm under the circumstances. Since the jury never saw the photograph, they had no idea what condition it showed the deceased in. Furthermore, merely because a young girl broke down does not indicate that the photograph was in any way inflammatory, since this would be a normal reaction of a girl who was friendly with the deceased upon seeing *any* photograph of her dead friend.

Finally, appellant contends, in an unsupported statement, that the trial judge committed error in not allowing the jury to know that one of his witnesses (his uncle, Mr. Wiggins) went to the district attorney's office under an allegedly illegal subpoena. (Subpoena stated on back that if witness did not appear he would be subject to bench warrant and arrest.) The thrust of this position seems to be (the brief is unclear on this point) that this witness was under pressure when he spoke to the district attorney in his office and also when he was on the witness stand because of the threat of arrest, therefore the jury should be apprised of this pressure so that they could fairly evaluate his testimony.

Appellant posits that this pressure could have affected the witness's statements and attitude when he spoke with the district attorney. If the witness were under pressure, it is not indicated on the record. In fact, during the conversation with the district attorney and during his testimony on the witness stand, the witness contested the truthfulness of a statement that the police say he had previously made (he claimed he made the first statement to police under threat of arrest) and he advanced a more favorable account of the

events that transpired between him and the appellant, all of which was beneficial to the appellant. If anything, advising the jury of the alleged pressure would in effect allow the appellant to impeach his own witness. This would result because the appellant would be saying that the pressure raises the possibility that this individual's statement to the district attorney and his subsequent trial testimony are subject to question with respect to truthfulness, when, in fact, these statements are the most favorable account of what happened given by this witness. Furthermore, the witness did not say he was coerced or intimidated, nor does this issue go to the guilt of the accused.

Judgment affirmed.

Mr. Justice POMEROY dissents.

Mr. Justice COHEN took no part in the decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I dissent for the reasons more fully stated in *Commonwealth v. Marabel*, 445 Pa. 435, 283 A. 2d 285 (1971).