341 A.2d 450
**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**John McDADE.**

Supreme Court of Pennsylvania.

Argued Oct. 7, 1974.

Decided July 7, 1975.

John J. Hickton, Dist. Atty., Robert L. Eberhardt, Louis R. Paulick, Asst. Dist. Attys., Pittsburgh, John M. Tighe, First Asst. Dist. Atty., for appellant.

John J. Dean, Stephen P. Swem, Pittsburgh, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

The Commonwealth has appealed from an order of the trial court suppressing certain incriminating statements made by John McDade, the appellee, in connection with the homicide of one Joey Wells.[1] The trial court, after a hearing on appellee's oral motion to suppress,[2] issued a blanket order suppressing all statements made by the defendant because he had not been advised of his constitutional rights as mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to his initial interview by the police concerning the Wells slaying; and suppressing all evidence obtained during the period between defendant's arrest and arraignment for the additional reason that that evidence was the product of an unnecessary delay in violation of Rule 118

---

1. It is clear from the record that the suppression of the challenged evidence will handicap the Commonwealth in its prosecution of the case. It is for that reason that the Commonwealth has the right to appeal from the suppression order. *Commonwealth v. Wormsley,* 461 Pa. 535, n. 1, 337 A.2d 282, n. 1 (1975); *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963).

2. It is to be noted that the oral motion to suppress did not comply with the requirements of Pa.R.Cr.P., Rule 304 and Rule 323, 19 P.S. Appendix (Supp.1974–75). *Cf. Commonwealth v. Turra,* 442 Pa. 192, 275 A.2d 96 (1971). The court apparently permitted the defendant to proceed on the basis of an oral motion to suppress because the court was aware of the fact that the defendant was represented by new counsel, and that previous counsel had prepared a written motion which had become misplaced before it could be filed.

 At the suppression hearing, the prosecutor objected to the motion on the ground that it was untimely, but neither that objection nor any other objection to the procedures employed below has been pursued on appeal.

of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix, and hence inadmissible under *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972).

The Commonwealth complains only of the suppression of two of the incriminating declarations: (1) a statement made by the defendant to two women friends; and (2) a statement made by the defendant to a fellow-inmate while he was incarcerated on an unrelated charge. For the reasons hereinafter stated, we conclude that the order was correct except insofar as it suppressed the statement made to the fellow-inmate. We will therefore affirm with an appropriate modification.

A review of the facts surrounding the giving of these statements is necessary. On June 8, 1972 the body of 14 year old Joey Wells was discovered lying in a creek in Fawn Township, Allegheny County. The deceased's hands were wired behind his back and there were indications that he had been shot three times. During the subsequent police investigation it was learned that John McDade may have been the last person to have seen Joey Wells alive. McDade was first interviewed concerning the Wells homicide on July 13, 1972. At that time he was not suspected as being involved in the crime; No *Miranda* warnings were given to him, and no inculpatory statements were made. The next day the defendant was transferred from the police station at the Borough of Tarentum to the Allegheny County Jail to commence serving a two-week sentence on a summary conviction for an unrelated offense. On the same day he was taken by county detectives to the Detective Bureau, where he remained in custody of the detectives for approximately eight and one-half hours.[3]

---

**3.** During this time McDade was interviewed by the detectives, had lunch in the Detective Bureau, was administered a polygraph test, and was taken to a restaurant for supper. It does not appear that any incriminating statements were made during this period.

Three days later, July 17, 1972, McDade was again interrogated. By this time he had become the focus of the investigation, and the questioning was preceded by the giving, apparently for the first time, of warnings concerning his constitutional rights, which were waived in writing. From noon until midnight of that day, the defendant was questioned intermittently, first at the Millvale police station,[4] then at the scene of the discovery of Wells' body, again at the nearby Fawn Township Municipal Building where he was allowed to talk for about an hour with his mother and sister, and finally at the Allegheny County Detective Bureau. During this period, McDade made various incriminating statements to the police, culminating in a seven-page written confession obtained after his return to the Detective Bureau. The taking of this formal statement began at 12:26 A.M., July 18, 1973, prior to which the defendant was again advised of his constitutional rights, which he again waived. He then was told by one of the officers that he was under arrest for the Wells slaying.

At about noon on July 18, 1972, McDade was taken by the police, at his own request, to the New Kensington, Pennsylvania home of two women friends for the purpose of discussing the homicide with them. The defendant was permitted to converse with the women in a room out of earshot of the police. After this conversation one of the women then told the police that McDade wished to change his story, but that he was afraid that the police would "be angry with him because he told you a lie with regard to the gun." Upon being assured that the police would not be angry, the woman requested McDade to repeat to the police the story he had told her and her friend. This he proceeded to do. He was not advised of

4. This interview took place at the Municipal Building of the Borough of Millvale, near Pittsburgh, in order to avoid numerous newsmen who were present at the Allegheny County Detective Bureau, where such interviews normally are held.

his constitutional rights before reciting this altered version of his story.

The detectives and the defendant then proceeded to Saxonburg, Pennsylvania, where McDade had indicated in his altered story that the gun he had used in the slaying might be found. A weapon was found, but, as it turned out later, it was not the gun used in the Wells murder. Upon returning to the Allegheny County Detective Bureau early on July 19, 1972, McDade made a supplementary written statement to reflect the changes in his earlier narrative.

Notwithstanding these various inculpatory statements, the police did not then formally charge McDade with the Wells murder because they believed they lacked sufficient corroborating evidence for a successful prosecution. Accordingly, on July 28, 1972, after having served his fortnight's sentence on the unrelated summary offense, McDade was released from the Allegheny County Jail and allowed to go free. Three months later, on November 1, 1972, while serving time in jail on still another unrelated offense, the defendant again made an incriminating statement concerning the Joey Wells slaying, this one to a fellow-inmate. The statement was communicated to the police by the inmate by letter.

As noted at the beginning of this opinion, the hearing judge suppressed all statements made by the defendant on the ground that he had not been properly advised of his constitutional rights at the outset of his interrogation by the police on July 13, 1972. The court believed that the taint thus created "so permeated defendant's status it was not removed by the [subsequent] rights warning."

In *Commonwealth v. Moody*, 429 Pa. 39, 239 A.2d 409 (1968), we pointed out that "[a] confession secured after the person involved has been adequately advised of his constitutional rights is not rendered inadmissible *ipso facto* because an earlier confession or inculpatory admission was made in the absence of a warning of these

rights, *Evans v. United States*, 375 F.2d 355 (8th Cir. 1967); *United States v. Hickey*, 247 F.Supp. 621 (E.D. Pa.1965)." 429 Pa. at 44, 239 A.2d at 412. See also *Commonwealth v. Frazier*, 443 Pa. 178, 279 A.2d 33 (1971). However, we have said that in order for evidence of a subsequent incriminating statement to be admissible, it must be "first established that the last statement or confession was not the exploitation of the original illegality and was obtained under circumstances sufficiently distinguishing to purge it of the original taint." *Commonwealth v. Banks*, 429 Pa. 53, 59, 239 A.2d 416, 419 (1968). See also *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Commonwealth has chosen not to contest the suppression of the formal written statement which McDade gave in the early morning of July 18, 1972, which preceded by approximately nine hours the statement to the women. We thus must accept as a premise the decision of the suppression court that the formal statement was vitiated by the initial failure of the police to give *Miranda* warnings on July 13. Although we do not have that particular statement before us, it apparently was of a seriously inculpatory nature. As such it formed an additional link in the chain of causality leading from the initial failure to inform appellant of his *Miranda* rights to his eventual admissions to his friends. See *Commonwealth v. Whitaker*, 461 Pa. 407, 336 A.2d 603 (1975).

 The Commonwealth urges that the statements to the women were voluntarily made in a non-custodial setting to persons unconnected with the police. Such factors, if truly present, would of course go a long way to dissipate any taint of previous illegality. Under the facts of this case, however, we cannot agree that these factors were established. The apparently damaging nature of McDade's formal statement to the police understandably created a compulsion upon him to "come clean" by giving the correct details about disposition of the

murder weapon. Realistically, viewed in light of the surrounding circumstances, the statement to the women, repeated to the police, was in the nature of a mere amendment to the previous invalid statement which appellant, apparently out of fear, chose to transmit through an intermediary rather than directly. The detectives were aware that McDade's purpose in requesting to see the two women was to discuss the homicide with them, and that conversation took place with police permission while they waited in the next room. Although this episode occurred outside of a police station, McDade was at all times in police custody and was under observation even during the conversation. We thus conclude that the Commonwealth did not sustain its burden of proving that the statement to the women was purged of the taint of the prior illegal statement; hence the new statement was properly suppressed. *In re Betrand,* 451 Pa. 381, 303 A.2d 486 (1973).

■ A different situation is presented in regard to the later incriminating statement given by the defendant to his fellow-inmate on November 1, 1972. This took place three months after his release from custody and without police intervention of any sort. A statement obtained under such circumstances cannot be said to be still affected either by the initial failure of the police to advise the defendant of his *Miranda* rights or by the subsequently obtained tainted statements. Cf. *Westover v. United States,* 384 U.S. 436, 496, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 736 (1966); *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). In concluding to the contrary, we think that the suppression judge erred.

■ We must deal, finally, with the finding below that the November 1 statement was the product of an unnecessary delay between the time of the defendant's arrest and arraignment. The suppression court found as a fact that the defendant was arrested at approximately

12:30 A.M. on July 18, 1972 when he was told by an interrogating detective that he was under arrest. The preliminary arraignment did not come about until April 23, 1973, more than nine months later. Based on these facts the court concluded, in light of the exclusionary rule announced in *Commonwealth v. Futch, supra,* that all evidence obtained before the arraignment, including the statement made to the fellow-inmate, must be suppressed as the product of that delay.

In our view, the court misperceived which arrest was the critical one for purposes of Rule 118 of the Rules of Criminal Procedure, and hence also for the application of *Commonwealth v. Futch.* The arrest the court found to have taken place on July 18, 1972 was negated or rescinded when the police, after consultation with the district attorney's office, decided to forego prosecution of the defendant at that time due to the absence of corroborating evidence, as noted above. It was for that reason that the appellee was neither arraigned nor otherwise administratively processed in connection with the Wells slaying, but instead was released upon the conclusion of his sentence on the summary conviction. At that point he was no longer in police custody and he remained at liberty until his arrest on another unrelated offense. It was during his incarceration on that offense that the statement was made to the fellow-inmate. McDade was not rearrested for the Wells slaying until April 23, 1973 and on that same day was preliminarily arraigned. For Rule 118 and *Futch* purposes, the critical time was that between his arrest and arraignment on that date. Because the statement to the fellow-inmate was not made during that period, there was no basis for suppressing it on the ground of unnecessary delay.

The order of the suppression court is modified so as to exclude from its operation the statement of the appellee to his fellow-inmate on November 1, 1972. As so modified, the order is affirmed.

NIX, J., filed a dissenting opinion.

JONES, C. J., did not participate in the consideration or decision of this case.

NIX, Justice (dissenting).

I agree with the majority opinion reversing the suppression of appellee's statement to his fellow inmate. However, I believe that it was also improper to suppress the statements made to appellee's two women friends. The majority concludes that because the statements given to the women were "in the nature of amendment[s] to [the] previous [inadmissible] statement . . . there was a 'real and direct causal connection' between the two." Moreover the majority finds that the statement to the women was tainted by the initial statement because appellee felt a "compulsion" to "come clean."

In my view the statements to the women were totally voluntary and independent of the initial illegality and the exclusionary rule to curb improper police conduct should not be applied to these statements.

First it is important to note that this is not a case where the friends to whom the statements were made were acting on behalf of the police, compare *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Indeed in this case appellee requested that he be taken to see the women. He talked with them alone and the statements made to them were totally voluntary. Clearly if a defendant, in custody, makes statements which are not the result of initiated interrogation, those statements are admissible. See *United States v. Mattson*, 469 F.2d 1234, 1237 (9th Cir. 1972); *United States v. Henderson*, 469 F.2d 1074, 1075 (5th Cir. 1972) cert. denied 410 U.S. 985, 93 S.Ct. 1511, 36 L.Ed.2d 181 (1973); 62 Georgetown L.J. (1973).

Furthermore the majority has failed to adequately establish a direct causal connection between appellee's ini-

tial statement and his statements to the women. The majority relies heavily on the fact that appellee felt compelled to use the women as intermediaries in order to "come clean" regarding misstatements in his initial statement. On the contrary the record reflects that appellee wished to speak to these women not because of the earlier statement, but rather because he wished to obtain advice and guidance concerning his predicament at that time. There is no evidence that he wished to tell the truth (i. e. "come clean") at the time he voluntarily initiated the conversation with the women or that he was coerced by the police to speak to the women. It was only after this conversation occurred that the police were told that he wished to be candid and to correct certain misstatements in his prior statement to them.

In *Commonwealth v. Greene*, 456 Pa. 195, 317 A.2d 268 (1974) the writer of the majority opinion in the instant appeal wrote:

". . . appellant's second statement was made after a time lapse of one and one half hours, in a different physical setting, to a different police officer; factors which we have recognized as significant in cleansing any taint from an earlier statement." *Id.* at 198, 317 A.2d 270 citing *Commonwealth v. Mitchell*, 445 Pa. 461, 285 A.2d 93 (1971).

Here the evidence reveals that the statements were made voluntarily at the home of two friends; that the statements were made only to these friends who were not agents of, nor employed by the police; and that the statements were made at least nine hours after the inadmissible statements to the police. Moreover there is no evidence that there was any police coercion before the statements were made; nor is there evidence that when appellee made the statements to these women he was motivated to do so by the initial statement to the police. Indeed the desire to correct former misstatements and be candid after meeting with these friends further suggests

that his motive in speaking with them was solely to obtain advice and counsel.

Under these facts I find no basis for applying an exclusionary rule designed to deter illegal police conduct. Accordingly I dissent from that portion of the majority opinion which upholds the suppression of the statements to the two women.