494 A.2d 413

**COMMONWEALTH of Pennsylvania**

v.

**Craig DATESMAN, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 27, 1984.

Filed May 31, 1985.

178

William L. Goldman, Doylestown, for appellant.

William F. Merz, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

Before WIEAND, MONTEMURO and CERCONE, JJ.

WIEAND, Judge:

Craig Datesman was sentenced to prison for life after a jury found him guilty of first degree murder in the shooting death of Jeffrey Birilli. On direct appeal, Datesman contends (1) that the evidence was insufficient to sustain the jury's verdict; (2) that the verdict was against the weight of the evidence; (3) that the trial court erred when it sustained challenges for cause to prospective jurors who were opposed to capital punishment; (4) that trial counsel was ineffective because he allowed the empanelling of a "death qualified" jury; (5) that the trial court erred in permitting the prosecution to refer to appellant's silence following

arrest; and (6) that the trial court erred by allowing the murder weapon to go out with the jury during deliberations. We find no merit in these contentions and, therefore, affirm the judgment of sentence.

The test for the sufficiency of the evidence is whether, after we have viewed all the evidence in the light most favorable to the Commonwealth and have drawn all reasonable inferences therefrom in favor of the Commonwealth, the evidence is sufficient in law to enable a jury to find each and every element of the crime charged beyond a reasonable doubt. *Commonwealth v. Carter,* 329 Pa.Super. 490, 495, 478 A.2d 1286, 1288 (1984); *Commonwealth v. Nelson,* 320 Pa.Super. 488, 491, 467 A.2d 638, 640 (1983).

The evidence demonstrated facts recited in the opinion of the trial court as follows:

On September 12, 1982, the victim and two women drove to the residence of Defendant to talk to him about money he owed two of them and which they desired to collect. They parked their van in a parking lot adjacent to the apartment building where Defendant lived and went up to the second-floor apartment he shared with his girlfriend.

A discussion about the money was held in the apartment and then, at the request of the Defendant's girlfriend, Defendant, the victim and the two women moved outside. The conversation continued on the outside steps and resulted in the victim striking Defendant. A brief scuffle ensued between the two men.

The victim saw two men approaching and apparently believed they were coming to join Defendant in the fight. He then told Defendant he would get his "boys" to fight also. Witnesses testified that Defendant replied he wanted to put a stop to the situation right then and was going to get his gun and shoot the victim.

The victim and the women then walked toward the van in preparation of leaving and Defendant went back to his apartment. However, Defendant returned a few minutes later and approached the van with a shotgun.

At this point, the victim was at the van, half sitting, half standing by the opened door. Defendant loaded the gun, raised it to his shoulder and according to testimony shouted to one of the women to move out of the way because he was going to shoot the victim. Defendant then fired the gun from approximately 20 feet from the victim and hit the victim in the neck. The victim died the following day.

Defendant testified that he was afraid for himself and his girlfriend, because the victim had said, "... he was going to get his boys or take what he wants." Defendant stated that he knew the victim owned a revolver. Finally, Defendant testified that he did not remember pulling the trigger and did not do so deliberately.

42 Bucks Co.L.Rep. 284, 285 (1983).

 This evidence was sufficient to support a finding of murder in the first degree. "An intent to kill can be formed in a fraction of a second. All that is required is a conscious, fully formed intent to bring about the death of another person." *Commonwealth v. Davis*, 331 Pa.Super. 59, 64, 479 A.2d 1077, 1080 (1984) (citation omitted). See also: *Commonwealth v. Thornton*, 494 Pa. 260, 267, 431 A.2d 248, 252 (1981). Proof of an intent to kill "may be inferred from the circumstances. If, from all the facts attending the killing, the jury can fully, reasonably, and satisfactorily infer the existence of the intention to kill ... they will be warranted in doing so. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or a pistol, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill; and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act." *Commonwealth v. O'Searo*, 466 Pa. 224, 236–237, 352 A.2d 30, 36 (1976), quoting *Commonwealth v. Drum*, 58 Pa. 9, 16 (1868). A fully formed intent to kill, therefore, may be inferred from the use of a deadly weapon upon a vital part of another's body. *Commonwealth v. Thornton, supra,*

494 Pa. at 267, 431 A.2d at 252; *Commonwealth v. Monaco*, 327 Pa.Super. 369, 376, 475 A.2d 843, 847 (1984); *Commonwealth v. Hartzell*, 320 Pa.Super. 249, 257, 467 A.2d 22, 27 (1983).

In the instant case, appellant had returned to the safety of his own apartment after the initial fracas. When he re-emerged with a shotgun, he shouted to a companion of the victim to get out of the way, lifted the shotgun to his shoulder, took deliberate aim at his victim, and shot him in the neck from a distance of approximately twenty feet. From this evidence, a jury could find a killing that was willful, deliberate, and premeditated. Appellant's testimony that he feared for his life and for that of his girlfriend because Birilli had threatened to "get his boys" and "take what he wants" was for the jury, which could believe some, all or none of it. See: *Commonwealth v. Stockard*, 489 Pa. 209, 213, 413 A.2d 1088, 1090 (1980); *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979); *Commonwealth v. Nelson, supra*, 320 Pa.Super. at 491, 467 A.2d at 640.

A new trial will be granted on the grounds that the verdict is against the weight of the evidence only where the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Jensch*, 322 Pa.Super. 304, 313, 469 A.2d 632, 636 (1983). Whether to grant a new trial for this reason is committed to the sound discretion of the trial court. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982); *Commonwealth v. Jensch, supra*, 322 Pa.Super. at 313, 469 A.2d at 636. The trial court's decision will be reversed on appeal only for an abuse of discretion. *Commonwealth v. Jensch, supra*, 322 Pa.Superior Ct. at 313, 469 A.2d at 636–637. We find no abuse of discretion in the trial court's refusal to grant a new trial on the grounds that the verdict was against the weight of the evidence in this case.

Recent decisions make it clear that appellant is not entitled to a new trial because of the manner in which the

trial court and defense counsel resolved actual and potential challenges to jurors who were opposed to the death penalty. In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that the execution of a death sentence imposed by a jury from which prospective members had been excluded for cause merely because they expressed general objection to the death penalty constituted a deprivation of life without due process of law. The *Witherspoon* decision, however, does not govern the instant case, for in this case the jury did not impose a death penalty. Instead, it imposed a sentence of life imprisonment. See: *Commonwealth v. Roach*, 444 Pa. 368, 371, 282 A.2d 382, 384 (1971); *Commonwealth v. Romeri*, 314 Pa.Super. 279, 295–296, 460 A.2d 1139, 1147–1148, *aff'd*, *Commonwealth v. Romeri*, 504 Pa. 124, 470 A.2d 498 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984). See also: *Commonwealth v. Jones*, 501 Pa. 162, 165–166, 460 A.2d 739, 741 (1983); *Commonwealth v. Jennings*, 446 Pa. 294, 300, 285 A.2d 143, 147 (1971); *Commonwealth v. Mitchell*, 445 Pa. 461, 467, 285 A.2d 93, 96 (1971).

In *Commonwealth v. Szuchon*, 506 Pa. 228, 484 A.2d 1365 (1984), the appellant, who had been sentenced to death, argued that even if the excusal of veniremen had been proper under *Witherspoon*, the "death-qualification" of the jury had produced a "prosecution prone" jury uncommonly willing to convict. The Supreme Court responded:

This argument was made and rejected in *Witherspoon* because the United States Supreme Court found the data compiled to that point "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." 391 U.S. at 517 [88 S.Ct. at 1774]. Appellant claims that the scientific and sociological surveys and data currently available have now conclusively established the "prosecution-proneness" of "death-qualified" juries and asks this Court to take judicial notice of this data to find his conviction impermissibly tainted. This we

decline to do, as we have consistently done in the past. *Commonwealth v. Story*, 497 Pa. 273, 287–92, 440 A.2d 488 (1981) (Larsen, J. Dissenting); *see also Commonwealth v. Roach*, 444 Pa. 368, 282 A.2d 382 (1971) *and Commonwealth v. Maxwell*, [505] Pa. [152], 477 A.2d 1309, 1316 (1984), *cert. denied*, [——] U.S. [——], 105 S.Ct. 370, 8[3] L.Ed.2d [306] (1984). Appellant has made no showing on the record that the process of "death-qualifying" a jury tainted his conviction in any way, and his "judicial notice" concept must be rejected—such "a loose concept of 'judicial notice' would make a mockery of the adversary system...." *Commonwealth v. Story, supra* at 497 Pa. 289, 440 A.2d 488 (Larsen, J. dissenting).

And, in a footnote, the Court added:

13. That the data remains too tentative and fragmentary to permit an appellate court to judicially notice that "death-qualified" juries are impermissibly prosecution-prone is demonstrated by the fact that, of the reported cases that have exhaustively analyzed the data following full evidentiary hearings, our research has discovered only one case in which a conviction has been overturned on the basis of that data. *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D.Ark.1983), on remand from Eight Circuit, 637 F.2d 525 (8th Cir.1980). *But cf. Keeten v. Garrison*, 742 F.2d 129 (4th Cir.1984) reversing the decision of the federal district court; *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978); *Hovey v. Superior Court of Alameda Co.*, 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).

*Id.*, 506 Pa. at 258, 484 A.2d at 1380–1381. See also: *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984).

This status of the law in Pennsylvania has not been altered by the decision of the United States Supreme Court in *Wainwright v. Witt*, 469 U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In that case, Johnny Paul Witt had been convicted of first degree murder and had been sen-

tenced to death. The Supreme Court used his appeal to clarify its decision in *Witherspoon* and to reaffirm the standard announced in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). That standard, the Court repeated, was whether a juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Applying the standard to Witt's jury, the Court concluded that a juror was properly excluded where a colloquy disclosed the following:

"[Q. prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

"[A. Colby:] I am afraid personally but not—

"[Q] Speak up, please.

"[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down."

469 U.S. at ——, 105 S.Ct. at 848, 83 L.Ed.2d at 846.

■ Application of the *Adams* standard to the instant case, quite apart from the fact that the jury in the instant case did not recommend a sentence of death, suggests that the prospective jurors were properly excused. Their views on the death penalty would have impaired the performance of their duties as jurors. Theresa Sugalski indicated that she would not be able to find appellant guilty of first

degree murder under any circumstances. Paul Vaughn would not say whether he could apply the law as instructed by the judge, stating that his attitude would depend on his mood on a particular day. William Wright said that he would be reluctant to find the appellant guilty of first degree murder knowing that the death penalty could result; he attributed this to a philosophical opposition to capital punishment. Frankie Cyray stated he would not be able to decide the case based on the law and the evidence. Edward Sokola said that under no circumstances could he impose the death penalty and that he would not be able to follow the law pertaining thereto as the court would instruct him. Florence Loux stated that she would not be able to apply the law as instructed due to her feelings about the death penalty. John Williams flatly stated that he could not serve in the case because he did not believe in capital punishment. The record thus reveals that each of the seven prospective jurors excluded would have been unable to apply faithfully and impartially the law as instructed by the trial court, each for a reason personal to the juror.

The record is devoid of any evidence that would show that the jury chosen to hear the charges against appellant was guilt prone or that appellant was otherwise prejudiced by the jury selection process followed by the trial court. Therefore, defense counsel was not ineffective for failing to object. Counsel will not be deemed ineffective for failing to raise or pursue a meritless issue. *Commonwealth v. Anderson*, 501 Pa. 275, 286, 461 A.2d 208, 213 (1983); *Commonwealth v. Courts*, 315 Pa.Super. 108, 132, 461 A.2d 820, 827 (1983).

The contention that the prosecution was permitted to comment on appellant's post-arrest silence arises from the following colloquy between the prosecuting attorney and the arresting police officer:

A. The white male was instructed to place his hands above in the air and to proceed down the steps and wait face down on the ground.

Q. Did he do that?

A. Yes, he did.

Q. Did he say anything at that time?

A. Yes. He was being searched by myself. He uttered, "I shot him."

Q. *Did he say anything else?*

A. *No.*

Q. How many times did he indicate—how many times did he say, "I shot him."?

A. I heard once.

Q. *He said nothing else other than, "I shot him."*

A. *Not to my knowledge.*

Q. What did you do then?

A. I completed the search and advised Officer Tegge to advise the subject of his rights and at that time Officer Tegge asked—

MR. WILDER [defense attorney]: Objection.

THE COURT: Sustained. Let me me [sic] you at sidebar.

(At this time a sidebar conference took place out of the presence of the court reporter.)

(Emphasis added.) After the sidebar conference, direct examination resumed. The defense did not move for a mistrial or request cautionary instructions. The only objection made by the defense was sustained by the trial court. Under these circumstances, it is difficult to find trial error. The trial court was not required to grant a mistrial or give cautionary instructions when no request therefor had been made.

■ Moreover, the colloquy between the prosecuting attorney and the arresting officer did not warrant a mistrial. The witness had heard appellant utter, "I shot him" while appellant was being searched. He was asked if at that time appellant had said anything else, and the witness answered that he had not. This was not a reference to post-arrest silence but to a post-arrest statement. There was no prejudice in this colloquy which would require the granting of a new trial.

Appellant contended at trial that the offending gun had discharged accidentally. The Commonwealth, therefore, offered testimony from a firearms expert regarding the firing mechanism of the gun and the amount of pressure needed to discharge the gun. The trial court thereafter permitted the shotgun to be taken out with the jury so that it could be examined during the jury's deliberations. Appellant contends that this was error.

Pa.R.Crim.P. 1114 vests discretion in the trial judge to determine which, if any, exhibits shall be taken out with the jury during its deliberations. The only exceptions consist of a transcript of trial testimony, a written confession, and an information or indictment. These may not go out with the jury. The Supreme Court has also suggested that, in general, exhibits requiring continuous expert opinion for accurate and proper examination and consideration of the evidence should not go out with the jury. *Commonwealth v. Pitts*, 450 Pa. 359, 366–367 n. 1, 301 A.2d 646, 650 n. 1 (1973). However, a murder weapon and testimony of a firearms expert "are not of such character as to require continued expert interpretation for the jury to properly evaluate the evidence." *Commonwealth v. Hobson*, 484 Pa. 250, 255, 398 A.2d 1364, 1367 (1979). See also: *Commonwealth v. Jennings*, 285 Pa.Super. 295, 300, 427 A.2d 231, 233 (1981). In *Hobson*, where the defense was accident, a firearms expert testified to differing amounts of pressure necessary to fire the gun with and without the gun's ejector rod. The ejector rod had been missing from the recovered weapon, and the expert testified that increased pressure would have been required to pull the trigger of such a gun. The Supreme Court held that the trial court did not abuse its discretion when it allowed the jury to examine the gun during deliberations. That decision is authoritative. Our examination of the record in the instant case does not disclose any abuse of discretion by the trial court in permitting the jury to examine the offending gun during deliberations.

Judgment of sentence affirmed.